## HUMBER v. HUMBER.

[68 South. 161.]

1. APPEAL AND ERROR. *Review. Question of fact. Divorce. Grounds. Cruelty.*

The supreme court on appeal will not reverse the findings of a chancellor on controverted facts, unless manifestly wrong.

2. DIVORCE. *Grounds. Cruelty.*
   To warrant the granting of a divorce on the ground of "cruelty" unaccompanied by personal violence, the misconduct of the spouse must be such as to affect the life or health or general safety of the complainant.

3. DIVORCE. *Grounds.*
   The law authorizing divorces for certain causes, requires a strict compliance with its provisions.

4. DIVORCE. *Review. Alimony. Counsel fees.*
   Under the facts in this case the court on appeal declines to hold that one hundred dollars per month is an excessive allowance for permanent alimony although the court below fixed the temporary alimony at only forty dollars per month.

APPEAL from the chancery court of Coahoma county. HON. M. E. DENTON, Chancellor.

Suit by James E. Humber against Lotta E. Humber. From a decree for defendant, plaintiff appeals.

The facts are fully stated in the opinion of the court.

*Mayes & Mayes,* for appellant.

*Cutrer & Johnston,* for appellee.

REED, J., delivered the opinion of the court.

This is a divorce suit. Both parties sought divorce, each from the other. The chancellor refused divorce to both of them.

The original bill was filed by the husband, James E. Humber. He relied upon the ground in the statute of habitual cruel and inhuman treatment. Mrs. Lotta E. Humber, the wife, filed an answer to the bill, denying the allegations thereof, and made her answer a cross-bill in which she asked for divorce on the ground of habitual cruel and inhuman treatment, and also prayed for alimony *pendente lite* and counsel fees, to enable her to defend the suit; also for permanent alimony, and for general relief in equity.

The chancellor on December 7, 1912, upon motion by appellee for the allowance of alimony *pendente lite* and counsel fees as prayed for in her cross-bill, ordered the appellant to pay her alimony at the rate of thirty dollars per month from September 29, 1910, the date when the original bill was filed, which aggregated the sum of seven hundred and eighty-nine dollars, and the further sum of one hundred dollars for account of her expenses in attendance upon court and preparation of her defense, and the further sum of two hundred and fifty dollars on account of fees to her solicitors in the cause. The chancellor further ordered appellant to pay his wife, from the time of the decree and during the pendency of this suit, the sum of forty dollars per month as alimony. From this decree an appeal was prosecuted.

Upon the final hearing of the cause on pleadings and proof, the chancellor in his final decree, after refusing to dissolve the bonds of matrimony, as prayed for in both the original bill and the cross-bill, retained the original bill, answer, and cross-bill for the purpose of securing to appellee proper allowance of counsel fee and sufficient allowance for her separate maintenance and support, and thereupon fixed her solicitor's fee at the sum of one-thousand two hundred and fifty dollars, which included the amount of two hundred and fifty dollars already allowed, and ordered appellant to pay to appellee, his wife, the sum of one hundred dollars per month, beginning with July 23, 1913, for her separate maintenance and support. From this decree appellant prosecuted his appeal.

By agreement of counsel for appellant and appellee, both appeals in this case are to be heard and considered together as one. Appellant, a planter of Coahoma county, in this state, and a bachelor who had reached middle life, was on July 12, 1910, married to appellee, then Mrs. Lotta Edson, who was about thirty eight

years of age, at her place of residence, the home of her mother in Mt. Vernon, Ind. Appellee had previously been married and was then divorced. The marriage between appellant and appellee followed a courtship, chiefly by correspondence, of some months, during which time Mr. Humber visited Mrs. Edson at her home. After the bridal tour of about two months, and as soon as the couple reached the home of Mr. Humber in this state, they separated, and shortly thereafter the divorce proceeding was instituted.

From the proof introduced by appellant, it appears his purpose to show that the cruel and inhuman treatment complained of consisted of the conduct of his wife in a number of incidents during their travels, in which she displayed temper and dissatisfaction with him and his provisions for her comfort and entertainment, and wherein she was inconsiderate of his feelings, abusive to him, discourteous and rude to his friends and kinsfolk, and generally disagreeable in her demeanor.

Appellant testified that the beginning of these incidents followed closely the marriage ceremony. He said that she claimed that he was not courteous to her friends when leaving Mt. Vernon; that she would not converse with him; that she charged him with flirting while on the train to Chicago, their first stopping point; that she was displeased with him for slipping his foot out of a tight-fitting shoe to relieve his discomfort; that she was dissatisfied with the Chicago hotel which he selected, and the room assigned to them, and sought to make him sleep on a round top lounge in the room; that she was angry and would not eat, because he insisted on using a carving knife while eating in a restaurant, and caused him mortification because her conduct attracted attention and created laughter; that she said she would return home, and wrote a letter to her mother, in which she threatened to commit suicide, leaving the letter where it could be seen by her husband.

He further said that she charged him with flirting upon
various occasions; that she refused to wait on him
when he was sick; that upon going, in their travels,
to the South, after visiting Waukesha, Wis., she com-
plained of the heat and mosquitoes, and continued to
nag and annoy him; that, while they were visiting in
the state of Georgia, the former home of appellant,
she refused to receive introductions to his former ac-
quaintances and friends, and slighted their offers of
courtesy, to the humiliation of appellant; that this con-
duct extended to his own relatives, including his mother,
well advanced in years; that she was frequently mad
and sullen, and upon nearing appellant's home in the
city of Memphis, in the latter part of September, she
demanded of him a thorough understanding as to what
he was going to give her, and said that she would not
live in the Mississippi bottoms with a man like appel-
lant until she knew she was to get something.

According to appellant's testimony, the unhappiness
of this bridal couple reached its climax when they left
the train at the railroad station, and were about to
proceed to appellant's plantation home, at Paradise.
It is in testimony for appellant that she was hysterical,
crying in a loud voice, and when she reached the home
she refused to eat or drink or receive any attention
whatever from the manager and his wife, demanded
that her trunk be returned to the station, and started
herself to walk from the residence, and was finally taken
to the station in a buggy. It is further testified to that
she refused then to return with appellant to his home;
that she continued to abuse him, demanding money of
him, and even threatened his life. A few days after
this Mr. Humber filed his bill for divorce.

Appellee never at any time inflicted a physical in-
jury upon appellant, and never made any effort or dem-
onstration to do so. The proof does not disclose facts
from which we may conclude that appellant appre-

hended bodily harm from his wife. Appellee in her
testimony denied many of the occurrences testified to
by appellant. Some of the incidents she admitted, but
stated them in a different way and put them in a
different light from that shown by appellant's ver-
sion. For instance, she admitted the carving knife
episode, but claims that it was at another time from
that given by appellant, and that the amusement was
caused, not by her conduct, but by his using the
knife. She admitted that she was displeased with the
room in the Chicago hotel, but denied that she conducted
herself in the disagreeable manner indicated by appel-
lant's statement, and says that the night was most un-
pleasant, for she could not sleep because of appellant's
snoring. She denied the account given by appellant
of her insulting treatment of his friends and relatives
in Georgia. She states that she was sick at the time of
her association with appellant's mother, and did not
intend to be rude to her. She also testified that she
was ill and nervous when she reached the railroad stat-
ion where they disembarked from the train to go to
the plantation. She says that she had never ridden
behind a mule before, and was very much disappointed
and displeased because she was going to Paradise in
such a rig drawn by such an animal. She accounted for
her conduct on that day on the ground of illness and
the heat, and her temporary displeasure. She claimed
that she desired to return and live with her husband,
whom she loved, and that she requested him without
delay to take her back.

It appears from the proof that appellant positively
declined to live further with his wife after she refused
to return to his home on the day of their arrival. The
correspondence between the parties is of more than
passing interest, because of the deeply affectionate
terms used therein, and the pledges of love and de-
votion during the courtship, and because of appellee's

letters, written to her husband after the separation, in some of which she expressed her earnest desire for reconciliation, and asked to be taken back by him; and in others she sought for a settlement with her husband on a financial basis, wherein she would receive from him a proper sum for her maintenance.

The testimony in this case is voluminous, and we do not in this opinion attempt to go into an extended statement of the facts as narrated by appellant and appellee. We have only set forth enough to show the case in its general nature. The proof presents a case where there has been a sad failure after a short trial of a venture in marriage. It seems that this trial of matrimony was not in the home, amidst its pleasant and quiet surroundings and the duties of domestic life, but was by the couple on a journey from place to place, stopping at city hotels and summer resorts, with the attendant trying experiences of such life upon two persons who had but short previous association and little knowledge of each other and their respective temperaments and habits.

The final decree of the chancellor against appellant in this case was on controverted facts, for we find that appellee's testimony was in clear conflict with that of appellant. We cannot say that the findings of the chancellor were manifestly wrong and we therefore cannot reverse him. We find in the final decree that the chancellor held that appellant was not entitled to the relief sought, even though his testimony be taken to be true. The chancellor decided that the facts as narrated by appellant in his testimony were not sufficient to sustain the charge of habitual, cruel and inhuman treatment which he relied on for divorce.

In former days the statute provided that divorce could be granted ''for habitual, cruel and inhuman treatment, marked by personal violence.'' The words ''marked by personal violence'' were omitted in the

Code of 1892, so that the statute now reads "habitually cruel and inhuman treatment." It is not necessary to show physical assault or actual personal violence under the present statute. It is very difficult to state any fixed rule as to what is cruelty in cases where there is no personal violence. It appears to be the general holding of the courts that the misconduct of the spouse complained of must be such as will impair the health of the complainant or to create an apprehension of bodily injury. The misconduct of the party must be such as to affect the life, or health, or general safety of the complainant.

We do not believe that there has ever been a clearer or more satisfactory discussion of the subject of divorce by reason of cruelty than that in the opinion delivered by Sir William Scott, in the celebrated case of *Evans* v. *Evans,* 2 Hagg. (English Ecclesiastical Reports) 310. Though extracts from this interesting opinion have been frequently inserted in the books, we feel that we are again justified in quoting therefrom, because we cannot find elsewhere a better statement of the principles of law applicable to this case, and we therefore make the following quotation:

"What is cruelty? In the present case it is hardly necessary for me to define it, because the facts here complained of are such as fall within the most restricted definition of cruelty; they affect not only the comfort, but they affect the health, and even the life of the party. I shall, therefore, decline the task of laying down a direct definition. This, however, must be understood, that it is the duty of courts, and consequently the inclination of courts, to keep the rule extremely strict. The causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged. . . . What merely wounds the mental feelings is in few cases to be admitted, where not accompanied

with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accomodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty; they are high moral offenses in the marriage state undoubtedly, not innocent surely in any state of life, but still they are not that cruelty against which the law can relieve. Under such misconduct of either of the parties, for it may exist on one side as well as on the other, the suffering party must bear in some degree the consequencies of an injudicious connection; must subdue by decent resistance or by prudent conciliation; and, if this cannot be done, both must suffer in silence. And if it be complained that by this inactivity of the courts much injustice may be suffered, and much misery produced, the answer is that courts of justice do not pretend to furnish cures for all the miseries of human life. They redress or punish gross violations of duty, but they go no further; they cannot make men virtuous; and as the happiness of the world depends upon its virtue, there may be much unhappiness in it which human laws cannot undertake to remove. . . . Of course the denial of little indulgences and particular accomodations, which the delicacy of the world is apt to number among its necessaries, is not cruelty. It may, to be sure, be a harsh thing to refuse the use of a carriage, or the use of a servant; it may in many cases be extremely unhandsome, extremely disgraceful to the character of the husband; but the Ecclesiastical Court does not look to such matters. The great ends of marriage may very well be carried on without them; and if people will quarrel about such matters, and which they may do in many cases with a great deal of acrimony, and sometimes with much reason, they yet must decide such matters as well as they can their own domestic forum. These are the negative descriptions

of cruelty; they show only what in not cruelty, and are yet perhaps the safest definitions which can be given under the infinite variety of possible cases that may come before the court. But if it were at all necessary to lay down an affirmative rule, I take it that the rule cited by Dr. Bever from Clarke, and the other books of practice, is a good general outline of the canon law, the law of this country, upon this subject. In the older cases of this sort, which I have had an opportunity of looking into, I have observed that the danger of life, limb, or health is usually inserted as the ground upon which the court has proceeded to a separation. This doctrine has been repeatedly applied by the court in the cases that have been cited. The court has never been driven off this ground. It has been always jealous of the inconvenience of departing from it, and I have heard no one case cited in which the court has granted a divorce without proof given of a reasonable apprehension of bodily hurt. I say an apprehension, because assuredly the court is not to wait till the hurt is actually done; but the apprehension must be reasonable; it must not be an apprehension arising merely from an exquisite and diseased sensibility of the mind. Petty vexations applied to such a constitution of mind may certainly in time wear out the animal machine, but still they are not cases of legal relief; people must relieve themselves as well as they can by prudent resistance, by calling in the succors of religion and the consolation of friends; but the aid of courts is not to be resorted to in such cases with any effect.''

Counsel for appellant contend that the conduct of appellee was such as to seriously impair the health of appellant. In the bill of complaint it is charged that appellant apprehended that his wife would do him great bodily harm and injury, and that it was not safe for him to live with her. We cannot say that the chancellor erred in holding that appellant's own testimony

109 Miss.—15

was insufficient to sustain his case. We cannot see from appellant's testimony that he has been injured in health, or that he apprehended at the time of the separation that his wife would do him great bodily harm and injury, nor do we see that it was then unsafe for him to live with her.

Viewing appellant's situation from his standpoint, it is most unfortunate. It is beyond question that there is decided incompatibility between the married pair; but incompatibility is not a ground for divorce in Mississippi. Appellant's experiences were doubtless trying. This is so frequently in married life, where divorces are not sought for, or even thought of. Besides, it is common knowledge among married people that in most cases it takes a period of time and association for the domestic partners to become so acquainted with the individual characteristics of each other, and adjusted one to the other in their thoughts and habits, as to make the course of their joint life smooth and not obstructed by discord. It is proper to take into account, in viewing this case, that Mr. Humber had lived a considerable part of man's allotted time as a bachelor, and, though of mature years, was quite inexperienced, when he married, in the ways of woman, which seem at times so inexplicable. He may not have prepared himself by contemplation and resignation for a committal "to serve a life term in matrimony." He may not have understood that woman in her "hours of ease" was "uncertain, coy and hard to please."

Marriage is a most solemn contract, provided for by the laws of the state and sanctified by the ceremonies of the church. The dissolution of its bonds is no light matter. The best sentiment of society is opposed to divorce. The law authorizing divorces for certain causes requires a strict compliance with its provisions. The church is guided by these words of eternal truth touching the subject:

"From the beginning of the creation God made them male and female. For this cause shall a man leave his father and mother, and cleave to his wife; and they twain shall be one flesh; so then they are no more twain but one flesh. What, therefore, God hath joined together, let not man put asunder."

It is claimed that the chancellor erred in allowing appellee alimony *pendente lite* and permanent alimony and counsel fees. After a careful review of all the testimony introduced on the hearing of the motions for alimony and counsel fee, we cannot say that the chancellor is in error as to these allowances. He had proof to sustain his judgment in fixing the amount of appellee's counsel fee, and from all before us we cannot decide that the fee fixed was unreasonable or exhorbitant in amount. So, also, from the proof before him as to the value of appellant's estate, the amount of property owned by appellee, the necessities of appellee, and the proper sum needed by her as appellant's wife for her maintenance, living separate and apart from her husband, we cannot decide that the chancellor erred in fixing the amounts allowed for alimony. Appellee was only allowed forty dollars per month for alimony *pendente lite,* and this suggests that perhaps the permanent alimony of one hundred dollars per month was too great in amount. Still, at this hearing and with all the facts before us, we cannot hold that the chancellor erred in so determining. Besides, this question may be brought to the chancellor's attention, and he is authorized on petition to change the decree, and from time to time make such new decree on the subject as the case may require.

*Affirmed.*

### ON SUGGESTION OF ERROR.

We note appellant's argument in his suggestion of error relative to the reduction by us of the amount al-

lowed as permanent alimony. We stated, in our opinion affirming this case, that the allowance of forty dollars per month as alimony *pendente lite,* suggested that one hundred dollars per month was too great an amount for permanent alimony, We deem it proper to say now that, if we had been hearing the case originally in the place of the chancellor, we would probably not have allowed alimony in so large a sum; but we cannot say from the evidence that he is manifestly wrong.

We must adhere to our former holding, and decline to enter any other judgment in the case. At the same time we again suggest that this matter may again be brought to the chancellor's attention.

*Overruled.*