TAYLOR *v.* TAYLOR

No. 41032 February 9, 1959 108 So. 2d 872

*Hugh F. Causey,* Cleveland, for appellant.

*Levingston & Bizzell,* Cleveland, for appellee.

LEE, J.

Ralph M. Taylor filed his complaint against Mrs. Mary Rose Brenner Taylor for a divorce on the ground of habitual, cruel and inhuman treatment. The answer of the defendant denied in detail all of the material allegations of the bill, and, by way of cross bill, prayed for compensation for her solicitor and permanent support and maintenance for herself and their son, Robert Morris Taylor. At the conclusion of the hearing, the court, by its interlocutory decree, awarded $200 as a solicitor's fee for the defendant's counsel, $117.27 to the defendant for her expenses in coming from Brooklyn, New York, and $100 per month for the support of the defendant and her son. The court took the question of awarding or denying a divorce under advisement for decision at the next regular term of the court. At that time, the court, in its final decree, granted the complainant a full and complete divorce and awarded to the defendant the sum of $100 per month, payable $50 on the 1st and 15th of each month for the support and maintenance of Robert Morris Taylor until further order of the court; but, apart from the relief heretofore stated, denied and dismissed the cross bill. From the decree entered, Mrs. Taylor appealed.

The sole question on this appeal is whether the court erred in awarding the divorce and in refusing to award any sum for the support and maintenance of the appellant.

The parties were married in Brooklyn, New York, on July 25, 1942, while the complainant was in the armed forces of the country. The boy, Bob, was born on September 25, 1943. Taylor came out of the service in 1945. He and his wife and son lived with his wife's people in Brooklyn for about ten months, during which time he

earned $40 per week as a service station attendant. He returned to Mississippi in the Fall of 1946, and thereafter worked as a painter. His wife and son visited him for about a month in May 1947, and again for about a week in 1948, at which time he went back to New York with them. They did not visit him again until 1953; but, during the interval, he went to New York on one occasion while Bob was having surgery. In 1954, his wife visited with him for two months, and in June of that year, he went to New York and brought his wife and son back to Mississippi in a pickup truck. After residing in the home of his parents for two or three weeks, they moved into an apartment, where they lived until his wife and son returned to New York in December. They came back to Mississippi about November 1955 and lived with Taylor in a house, which he had built, until school was out in May of 1956, at which time, they went back to New York, and had not returned since. The time, during which the parties lived together in Mississippi, was approximately sixteen months.

At birth, the boy had a hypospadias condition, that is, an abnormality of the penis. It was just a piece of flesh and there was no canal for urination. Excretions were made through the opening for the scrotum. He had to sit down for that purpose. The first doctor, who examined the boy, was of the opinion that he was a hermaphrodite. As the boy became older, his personality was seriously affected. In school, his playmates laughed at him when he went to the toilet, and he did not want to go to school. Widely known New York doctors advised that, if this condition was not remedied, he would never have any sex life. To overcome this deformity, it would be necessary to make a new canal and do plastic surgery. It would be long and tedious. Over a considerable period of time, they performed ten operations. While the repair work is not yet complete, the boy has already been greatly benefited. Now at fourteen years of age, he is in the

ninth grade, is reaching normalcy, shaves twice a week, has a heavy voice, can urinate from his penis, and does not have to sit down for that purpose any more.

Taylor testified that his wife's attitude about the house, the deed to which was in both of their names, was that "the location wasn't right"; it was "too far out of town"; she "would not make any choice in the selection of colors"; and "she said she was not going to live in that house." They had a lot of differences. He was not employed in a respectable job and was not making enough money; his friends "were not much", and were not welcome in her house; she did not like his work and the hours were too long for what he was making. They would quarrel. He would try to "shut up" at first, and if that would not stop her he would walk out of the house. "She would run me off from the house." He and his son got along all right on minor corrections, but, if she did not agree, she would attempt to overrule him in the boy's presence. He wanted his son's condition to be corrected, but thought it could be done in the South nearer home and the doctor told him that it could be done here but she would not hear to this and said that she was going to continue with the doctors in New York. He said that the effect of her attitude and treatment were such that it was on his mind all of the time; he would neglect his work; he would forget things and have to redo his work; and that this troubled him very much all of the time. "There were times when he did not think that he would be able to live any more." However, when she was away, there was no domestic trouble on his mind. He did not think that they could live together with reasonable happiness and satisfaction. He was willing to accept the full custody of the boy and contribute to his support within his means.

O. S. Sizemore testified that he had known Taylor for twenty years. As to Mrs. Taylor's attitude and manner toward her husband, he said "I would like to have my wife treat me a little better * * * I think she could have

treated him a little better." Also "While she was here, Ralph appeared to me to be in a state of strain and as soon as he was released from her company, this appearance disappeared." And "it seemed that they weren't interested in each other and they did not care too much about being with any company * * * They didn't seem to be enjoying themselves by being out."

Wilson Alexander testified that he visited in their home on one occasion. When Ralph suggested that they go to the store and loaf until supper was ready, Mrs. Taylor said "No, you are not going anywhere." So he decided that he was not welcome, made an excuse, and left. During the last three or four years "When Mrs. Taylor wasn't here, Ralph seemed to be himself and he joked and carried on, but when she was here, he seemed to be down and out and he did not have much to say. He seemed to be a kind of different man to me."

R. K. Winter testified that he had known Taylor for eight years, and he said that "during the time that she was here, he was moody, preoccupied and not his usual self at all * * * He just couldn't do his business right and did not take as much interest in his work." He said that "when she left Mississippi, the work improved."

Mrs. Taylor testified that her husband seemed averse to having the boy's trouble corrected, and talked about the cost of the treatment, saying that he had a couple of specialists in mind. But the witness thought that it was necessary to have specialists in the particular line for which her son was to be treated. Inasmuch as it appeared that the operations and treatment had been successful, she let her husband know that she was ready to come to Mississippi and live with him. On June 10, 1957, she wrote a teacher at Cleveland that her son would be in school there at the next session. She offered in evidence letters from her husband dated November 3, 22, and December 29, 1956; June 3, 5, July 3 and August 3, 1957; and a letter from her husband's attorneys dated July 15,

1957. There had been no complaint from her husband until the latter of July 3rd; and, following the letter from the attorneys of date of July 15th, in which they advised that her husband desired to obtain a divorce, his letter of August 3rd "guessed she knew what he was doing."

Mrs. Taylor also testified that the artificial opening had to be kept open; she said that she did not mistreat her husband's friends; that his work did not matter with her so long as they could live and eat; that her husband was moody from the time she met him; and that sometimes he was happy and that sometimes he was moody, just like other people. When the boy was two years of age, his father once "beat him up" pretty badly. Only one time, while the boy was going through these operations, did his father come to see him in Brooklyn. She denied that she had treated her husband in a cruel and inhuman manner.

The effect of her evidence was that their enforced absence from each other was due solely to their son's unfortunate situation, which she was so anxious to have corrected. Since this now seems to be almost accomplished, she wants the family to live together.

This Court, in Humber v. Humber, 109 Miss. 216, 68 So. 161, laid down the rule as to what constitutes habitual, cruel and inhuman treatment, short of actual personal violence, as follows: "It appears to be the general holding of the courts that the misconduct of the spouse complained of must be such as will impair the health of the complainant or to create an apprehension of bodily injury. The misconduct of the party must be such as to affect the life, or health, or general safety of the complainant."

In Russell v. Russell, 157 Miss. 425, 128 So. 270, it was said: "Cruel and inhuman treatment, unaccompanied by personal violence, within the meaning of the statute, is such conduct only as endangers life, limb, or health, or creates a reasonable apprehension of danger thereto,

thereby rendering the continuance of the marital relations unsafe for the unoffending spouse, or such unnatural and infamous conduct as would make the marital relation revolting to the unoffending spouse and render it impossible for him or her, as the case may be, to discharge the duties thereof, thus defeating the whole purpose of that relation.''

See Bunkley and Morse's, Amis, Divorce and Separation in Mississippi, Sec. 3.14 (3), p. 114; Stringer v. Stringer, 209 Miss. 326, 46 So. 2d 791.

 The appellee relies largely on the principle in Hoffman v. Hoffman, 213 Miss. 9, 56 So. 2d 58, where the case made by the husband was meager, and the Court said: ''There is no showing of an habitual course of cruel and inhuman treatment such as would endanger life or limb or create a reasonable apprehension of danger thereto thereby rendering the continuance of the marital relations unsafe for the unoffending spouse. Yet it may be sufficient if such conduct endangers health, or involves 'such unnatural and infamous conduct as would make the marital relation revolting to the unoffending spouse and render it impossible for him * * * to discharge the duties thereof, thus defeating the whole purpose of that relation.' Russell v. Russell, 157 Miss. 425, 128 So. 270, 272. It was within the competence of the learned chancellor to take into account the whole picture presented by testimony in support of the bill and cross-bill and to follow a judicial intuition, read between the lines of such testimony, and interpret it in the light of the conduct and demeanor of the witnesses upon the stand, and to decree in the light of 'all the facts and circumstances in the case' that a continuance of the relation was legally and practically impossible. The cross-bill indicated more than a willingness on the part of the wife that a divorce be granted. The chancellor must have accepted the testimony of the husband that the treatment complained of

was the direct cause of a mental distress which caused him to lose some thirty-five pounds in weight.''

In the above-mentioned Hoffman case, there was some basis on which the trial court was justified in concluding that the mental distress, on account of his wife's treatment, caused him to lose thirty-five pounds in weight, but, in the present case, there is no proof whatever that the appellee suffered any such disastrous consequences.

■■■ While it is true that ''All of the acts of cruelty should be considered together and as a whole in determining the character of appellant's conduct'', Sandifer v. Sandifer, 215 Miss. 414, 61 So. 2d 144, in the present case, the evidence fails to show abusive language, or continuous neglect, slander, unsociability, or threats of physical violence. There is an utter absence of any reasonable apprehension of physical danger or actual distress, which caused a loss of weight, or injury to health, or made it impossible for appellee to discharge the duties of the marriage, or cause the purpose of that relation to be defeated.

The evidence does not disclose that the appellee made such demand upon the appellant to come to Mississippi, which, if not complied with, could serve as a basis for a charge of willful, continued and obstinate desertion. There was no charge of that kind in the bill. If charity is ever to be indulged, undoubtedly it should be bestowed upon a loving and compassionate mother, who seeks to remedy an unfortunate deformity in her son, whom, in travail, she has brought into the world.

■■■ The evidence as to habitual, cruel and inhuman treatment was insufficient on which to base a decree of divorce. Consequently the decree thereon is reversed, and a decree, denying the appellee a divorce, will be entered here.

The decree, denying support and maintenance for the appellant, is reversed, and the cause is remanded so that the trial court may make a proper award for that purpose.

The trial court awarded the appellant for the services of her counsel in that court the sum of $200; and one-half of that amount, to wit: $100, payable within ten days, is awarded for her counsel in this Court.

Reversed and decree here in part; reversed and remanded in part; and solicitor's fee allowed.

*McGehee, C. J.,* and *Kyle, Arrington* and *Gillespie, JJ.,* concur.