637 So.2d 850 (1994)
Sheila Rozina Phillips CHAMBLEE
v.
David Glenn CHAMBLEE.
No. 92-CA-01252.
Supreme Court of Mississippi.
June 2, 1994.
*852 Daniel S. Spivey, Jackson, Jack W. Brand, Gerald & Brand Firm, Newton, for appellant.
Julie Sneed Muller, Phelps Dunbar, Jackson, Robert W. Long, Herring Long & Joiner, Canton, for appellee.
Before HAWKINS, C.J., and McRAE and JAMES L. ROBERTS, Jr., JJ.
HAWKINS, Chief Justice, for the Court:
David Glenn Chamblee sued for a divorce from Sheila Rozina Phillips Chamblee on the grounds of adultery. Sheila Rozina Phillips Chamblee then countersued for divorce on the grounds of cruel and inhuman treatment. The chancellor granted a divorce to David Glenn Chamblee on the grounds of adultery. Sheila Rozina Phillips Chamblee has appealed the chancellor's findings in regards to several issues in a divorce case, arguing that these issues were wrongfully decided. This court holds that some but not all of the issues were wrongfully decided. We therefore affirm in part and reverse and remand in part.

*853 FACTS

Sheila Rozina Phillips Chamblee and David Glenn Chamblee were legally married in Leake County, Mississippi on August 22, 1981. Justin Glenn Chamblee, the one child produced by this marriage, was born five years later on October 11, 1986. The couple separated on May 30, 1991, when Sheila moved out of the marital home located at 950 Pine Hill Circle in Carthage, Mississippi.
Sheila claimed in her testimony that the two of them had been arguing for some time before the separation and that much the marital discord was caused by her husband's attitude towards her career. Sheila had been an employee of the Carthage Company since 1975. In 1989 Sheila started working for them under Gary Brashers as a contract manager, a job that required much more traveling than her previous position. According to Sheila, this additional traveling greatly upset her husband.
David and I virtually argued every single day that he was home about my job. He would call me at work; he would call me when he would be at work. If I would tell him that I was going on a trip, he would just, you know, tell me not to go, tell me I was his wife, that he did not want me to go, that he wanted me to quit my job, and he would even call me at the plant on occasions when he knew that I would be leaving that morning or that afternoon demanding that I not take that trip.
Sheila also testified that David's temper would sometimes push him beyond using words to using physical force, both with her and their son Justin. She claimed that she was physically abused by David on three specific occasions in the three months that led up to their separation. The first alleged instance of abuse came when Sheila intervened while David was disciplining their son.
He admitted that he had lost control, but we were virtually arguing over the discipline that he had given Justin. We were arguing back and forth, and he slapped me; he grabbed me; he threw me against the wall, told me that Justin was his son, and he could discipline him any way he wanted to.
Sheila claimed that the second such instance came in April of 1991. "I was at home one day for lunch, and we started arguing again over the same thing, about the fact that I was going to take a trip or had taken a trip, or just about the traveling, and we started arguing, and he slapped me."
According to Sheila the final occasion that David physically abused her was in May of 1991.
David had moved out of the marital bed in March of '91, the same night that we had the fight with Justin, and David and I had the fight, David moved out of the marital bed. This was in May before he was going back to work  I think it was like a couple of nights before he was going back to work. He came into the bedroom, and he told me that I was his wife, and that he was going to have sex with me. I told him that I was not, and he forced me to have sex against my will. He came back the next night or a night later and told me again that he was going to have sex with me, and I told him if he touched me again, I'd leave. He called me after he had gone back to work; he told me that he was going to leave work, was going to take all the money out of the savings account, that he was going to take Justin, and that they could leave, and I would never see either one of them again.
Sheila also cited several other non-specific instances of physical abuse. "He ... grabbed and threw me against the wall on numerous times. He has only slapped me in the face on three occasions, but over a course of a year, he would grab me, push me against the wall, throw me against the wall, tell me that I was his wife, and that I would do what he wanted me to do."
Sheila claimed that these incidents would leave bruises on her arms and make her face red. Pam Wiskus, a neighbor and friend of Sheila's, testified that she saw one of these physical manifestations. "I have watched her; I saw bruises, and  on her arms from here (indicating)  that was the result of arguments." However, on cross-examination it was revealed that Pam Wiskus did not have first-hand knowledge as to how the bruises were caused.

*854 Q. You don't know how they got there of your own personal knowledge; do you?
A. Apparently not.
Q. Other than what you have been told, you weren't there and you didn't see it?
A. That's right.
After these instances of physical abuse were alleged to have happened, David sent a letter to Sheila postmarked May 28, 1991, which says in part, "I know that I have said and done things that have caused you great pain. I am SORRY for ever hurting you. I know that I can't take back this hurt but I need the chance to show you that we can still be happy together."
Sheila testified about two specific instances of David physically abusing Justin. The first occurred when David was trying to make Justin sleep in his own bed.
David had laid down with Justin to try to get him to sleep. David thought it was time for Justin to sleep in his own bed, and he was trying to force him to do that, and after about 30 minutes, David started screaming at Justin, and one thing led to another, and I knew the situation was getting out of hand just by the tone of David's voice, and yes, I did go into the bedroom ... (H)e was hitting Justin, and he was shaking him also.
According to Sheila, David's treatment of Justin went beyond normal disciplinary measures. "It wasn't the fact that David was disciplining Justin because at times children do need that. The problem was that I know David very well, and I know when he is out of control, and I know that this was one of these times."
Sheila said that the second incident of abuse took place when David was trying to give Justin a bath.
Justin had decided this night that he did not want to take a bath, and he and David were in the bathroom, and David was telling him to take his clothes off, and Justin was telling him, no, he wasn't, and this went back and forth, and then David kept getting louder and louder; Justin was crying, and I went into the bathroom, and David was spanking Justin, and I told Justin don't, just please stop, that I would finish the bath, and David left the house. He was out of control, and he left the house.
According to Sheila, David's temper led to many of the arguments and much of the physical abuse. She testified that when David would lose his temper, "He loses control. You can't talk to him; you can't do anything; he is just crazy  he acts crazy when he gets like that."
In his testimony, David denied ever physically abusing Sheila.
I have never hit Sheila in the entire time we were married. I have never hit her. She accused me of pushing her against the wall in the deposition. I have not. On one, possibly two occasions, I did grab her arms around her wrist and hold her. Once I remember we were arguing, and she was going to walk off and not listen to what I had to say, so I grabbed both wrists and held her there until I finished what I was saying, but I did not hold her with enough force to harm her.
In his testimony David specifically mentions the letter postmarked May 28 that he sent Sheila. According to him he was not speaking of physical pain he had caused Sheila but "emotional pain. We had done a lot of arguing, and both she and I had suffered a lot from the way we were not getting along, and I felt like it would apologize for any time I  trying to apologize to her for any time I had upset her."
David also denied that he has ever lost his temper with Justin or that he has ever used unnecessary force when he was disciplining Justin. He further testified that "I have never lost control when disciplining my son. Yes, I have spanked him. He's like any other child  at times it warrants it or I think it does, but I have not lost control with my son."
When Sheila went traveling for the Carthage Company, she was sometimes accompanied by her boss, Gary Brashers. David testified that this too caused problems.
She started traveling with him, and she was not concerned with the home activities as much then, and I discussed this with her. And I didn't like the fact that when *855 they traveled they would go back to the lounge at night and drink drinks before going back to the motel rooms, and I didn't think this was appropriate for her to be doing with another man.
David suspected his wife was engaged in an adulterous affair with Gary Brashers even before their separation. He testified that it was not until after she had moved out, however, that he was able to get what he considered to be the first real proof of their liaison.
She moved out that Friday. She did not come back to Carthage that Friday night. Saturday she returned, and I went down Saturday night, and she and I moved some furniture to her apartment. I left her apartment around midnight that night, drove back to Carthage. Then when I got to Carthage, I started thinking, wondering if she was going to stay at that apartment or not, so I left and went back to Jackson. I arrived at the Mark Apartments around 3:30 that morning, and her van was not there. So I started driving through all the apartment areas in that area. I rode through I think about 12 apartment complexes before I found her van about 5:45 that Sunday morning. I drove up at the Diplomat Apartments, and Gary Brashers' Lincoln was sitting in the parking slot numbered for Apartment Number 320; his company vehicle was sitting a couple of apartment spaces down; then Sheila's van was parked right across the drive from those vehicles.
Sheila admitted that she did have an affair with Gary Brashers which started soon after she left the marital home in May of 1991 and which lasted until to June of 1992. She also maintained that she and Gary Brashers were only friends before she and David separated. It was later revealed at trial that Gary Brashers received a divorce from Linda Brashers that was finalized on May 23, 1991, approximately one week before Sheila and David's separation began. Furthermore, Sheila moved from Carthage to the Mark apartments in Jackson, an apartment complex that is located less than three miles from Gary Brashers' home in the Diplomat apartments.
Perhaps the most hotly contested issue at the trial was that of proper custody for Justin. A great deal of evidence concerning Sheila and David's fitness as parents was proffered in an effort to decide this issue. Much of the testimony on this point was in regard to the time that the two parties' work schedules kept them away from home and the continuity of care that this enabled them to give Justin. Before the separation, David worked on oil rigs off the coast of Louisiana and Texas. This job required him to be away from home two weeks out of almost every month from the time of Justin's birth in 1986 until he started a new job after the separation in 1991. The only times he was able to spend more than two weeks a month at home was during periods of unemployment. Because he was forced to spend so much time away from home, he missed several holidays and birthdays as well as other significant events in Justin's life. From September 1991 to the time of trial he had been working with the Mississippi Highway Department in a job which enabled him to spend more with his son.
Between 1986 and 1989 Sheila's job with the Carthage Company did require her to spend some amount of time away from home traveling. In 1989, however, her time away increased significantly when she took the position of contract manager. After examining travel records taken between January of 1990 and April of 1992, Sheila concluded that,
I was away in this two and a half period (sic) and it came up to a total of 87 nights, which is equivalent to 12 weeks in two and a half years of total time that I was gone. More than half of these trips were one or two nights, overnight on an individual trip. Eleven of these were three nights; three of these were four nights, and only two of these were five nights.
In May of 1992 Sheila's job at the Carthage Company changed so that her time spent traveling away from home was appreciably less than before.
Testimony was also given as to who had the best parenting skills and which parent had the willingness and capacity to provide primary health care. Sheila pointed to David's alleged abuse of Justin as proof that *856 her husband possessed inadequate fathering skills. In contrast, family friend Charlotte Brown testified that Sheila was a fit parent and that she had allowed her own six-year-old son Kevin to spend the night at Sheila's house when David was away.
David, not surprisingly, claimed that he had the better parenting skills. In addition to denying that he abused Justin, David presented several witnesses who testified that he was a good father. Charlotte Brown described David as having "an outstanding reputation" and further stated,
[E]veryone thinks very highly of David. All his neighbors would make comments to me about how much time he devotes, you know, to the house and keeps everything neat and how much time he devotes to Justin. I mean he is always doing it, letting him ride bikes or walking behind him or the soccer you know. I mean he is a very kind and considerate person, you know, very loving and wants to do exactly what is right for Justin.
Sheila herself testified that David is basically a good father and that he is capable of giving the type of day-to-day care that one must provide to raise a child.
Another issue concerning child custody concerned the employment of the parents and the responsibilities of that employment. At the time of trial Sheila had been working for the Carthage Company for seventeen years and was earning $26,000 a year. David had been working for the Highway Department for just over a year, and was earning $9,600 a year although he had just received a promotion that would increase his salary between $175 and $650 a month.
The age of the parents as well as their physical and mental health was also discussed. At the time of trial Sheila was 36 and David was 39. Furthermore, there was no evidence proffered which would indicate any physical infirmities on the part of either party.
However, testimony as to David's temper and loss of control could be seen as evidence of a mental health problem of some sort. According to Sheila, "he is just crazy  he acts crazy when he gets like that." In regard to Sheila's mental condition, she testified that she had had emotional problems and was still trying to put her life back together at the time of the trial.
There was much testimony as to which parent Justin had stronger emotional ties with. Pam Wiskus stated that,
I would say that they both have strong personal ties with Justin... . I know that Sheila definitely would. Now, Sheila would definitely have them strong, and I'm not for sure about David because I'm haven't been around him that much in the last year. But I know that Sheila's bonds with her son are very strong.
Peggy Gomillion, one of Sheila's co-workers at the Carthage Company, also testified that Justin had strong emotional ties with his mother but did not comment as to his emotional ties with his father.
Many witnesses also claimed that David and Justin had close emotional ties. Charlotte Brown stated that Justin definitely has stronger ties with his father than his mother and that "he has always been closer to his daddy." Dallye Jones, who lived next door to the Chamblees in Carthage, also said that Justin was closer to David than Sheila. Gloria Woitt, who ran Lollipop Junction, Justin's daycare center, said that Justin, "seems very close to his daddy, calls his daddy his best buddy. And I don't know if the Court can understand that, but with children, if they say that, it means a lot." She went on to testify that Justin's emotional ties with David were closer than his ties with Sheila.
Another area which received a great deal of attention was the relative moral fitness of the two parents. There was no testimony which impugned David's moral character. In contrast, questions about Sheila's character were raised by more than one witness. Reverend William Stout, pastor of the Trinity Baptist Church that the Chamblees once attended in Carthage, stated that since the time of Sheila's affair with Gary, "there are some questions that have arisen about her reputation." He further testified that David was more morally fit to raise Justin. Charlotte Brown also stated that the affair ruined *857 Sheila's reputation while David's reputation was still excellent.
Sheila stated that although she still has some feelings for Gary, the affair was over and she knew that it had been a mistake. She also said the important thing was "getting my life together so that I can be the best mother possible for my son. Justin's well being is my first concern, and I have learned from my mistake, and I will never allow anything else to ever cloud my judgement."
Justin's home, school, and community record was also taken into consideration. He attended Lollipop Junction day care center exclusively from the time he was six months old until he started attending the Carthage School in August of 1992, a period of about five years. Sheila, who was residing in a condominium in Brandon, Mississippi, at the time of trial, stated that if she was awarded custody of Justin he would attend Northwest Rankin school. Sheila also stated that whenever Justin was staying with her in Brandon, the two of them would go swimming, play T-ball and soccer and go to movies and Chuck-E-Cheese. Before the separation, Justin attended Trinity Baptist Church with his parents. Afterwards he would still go to church whenever his mother had custody, first at First Baptist Church in Jackson and then at Pinelake Baptist Church in Brandon. When Justin stayed with his father at the former marital home in Carthage, he would frequent Lollipop Junction in the afternoons after going to the Carthage School and attend Trinity Baptist Church. The two of them would often hunt, fish, and play ball together.
The final child custody issue brought up at trial was the stability of the parent's home environment and employment. Sheila lived at the Mark Apartments in Ridgeland from June 1, 1991, to June 1, 1992, then moved to the Woodlake Apartments in Brandon. At the time of trial there were only two months remaining on her six-month lease although she planned to renew it and stay at Woodlake. In regards to her employment, Sheila had been with the Carthage Company for 17 years at the time of trial although her recent termination of the affair with her boss had cast some degree of uncertainty on her professional future.
David was still living at the former marital home in Carthage at the time of the trial and had no plans to move. In regards to his career, he had been working for the Highway Department for only one year but had recently received a promotion.
Another significant issue addressed by the court was that of the proper division of the couple's property. The first account that the parties contested ownership to was Carthage Bank IRA Account # XXXXX which was valued at $14,835.92 at the time of the trial. According to David, "it's in my name. This is an account that money was placed there jointly between Sheila and I."
The next account was Carthage Bank IRA Account # XXXXX, then valued at $14,873.49. David stated that, "(It) is an IRA account at the Carthage Bank which the money placed there was a rollover from a retirement account I had when I worked off shore. That company sold out and paid us our retirement, and I rolled it over into an IRA."
Also in dispute was an IRA account with Legg Mason Mutual Fund worth $55.05. According to David, "this money was part of what was given to me when Dixi-Lyn Field Drilling was sold, and I rolled this money over into a mutual fund." David further claimed that this account and a Washington Mutual Investor's Fund IRA came from retirement accounts he had at Dixi-Lyn.
The largest account in contention was a Carthage Bank Certificate of Deposit valued at $26,755.63. David described it as, "in Justin's name with my name and Sheila's on it. This was money that we put in there as a savings account. It was listed in Justin's name for tax purposes."
The proper disposition of various stock holdings was also at issue. The first of these were 590.42 shares of stock in Panhandle Eastern Corporation. According to David, the stock was bought as part of a payroll deduction plan he participated in while working at Dixi-Lyn Field Drilling Company. Furthermore, there was a dispute as to the ownership of several shares of Wal-Mart stock which, according to David, were purchased *858 from money in Sheila and his savings account.
David also testified that the marital house at 950 Pine Hill Circle had been fully paid for and that both he and Sheila had paid money towards its purchase. He further stated that both their 1985 Silverado pickup truck and their 1989 GMC Safari van were completely paid for and that he and Sheila had contributed towards the purchase of both cars. Similarly, 10 acres of land located in Leake County were also fully paid for by both spouses. Sheila's testimony does not contradict David's testimony as to these property matters.
The final significant factual issues were those of attorney's fees and costs of the action. Julie Muller, counsel for David Chamblee stated that,
I have been an active trial attorney in this area for more than eight years, and a reasonable rate for lawyers of my experience and expertise in this area is $95 an hour. Mr. Chamblee retained my services on June 3, 1991. Since that time Mr. Chamblee has incurred $23,085 in attorney fees, which represents 243 hours of my time, and $2,039.78 in disbursements. The disbursements would include court reporter's fees, service fees, mileage, postage, filing fees, deposition fees, copying. Mileage is charged at 25 cents a mile. These records don't reflect any duplication of effort, and these attorney fees are not contingent on the outcome of this case. This is also exclusive of Mr. Long's fees.
Julie Muller also testified that her records did not differentiate between hours spent working on issues of divorce and hours spent working on issues of child custody.
Daniel Spivey, attorney for Sheila Chamblee, rested his case and then attempted to give testimony as to his fees and the costs of the action. The chancellor refused to hear this testimony as Spivey had already rested. Spivey did not object to the chancellor's order.

LAW
At the end of the trial, Chancellor Montgomery requested that both the plaintiff David Chamblee and the defendant Sheila Chamblee furnish the court with proposed findings of fact and conclusions of law. In reaching a final verdict in this case, the chancellor made a few independent findings of fact and conclusions of law as to two or three issues and adopted David Chamblee's findings of fact and conclusions of law for the rest of the issues. Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987), concerns a case quite similar to the one at bar. The chancellor there also adopted a party's findings of fact and conclusions of law. In that case, this Court stated that,
[t]hese findings (of fact) simply are not the same as findings independently made by the trial judge after impartially and judiciously sifting through the conflicts and nuances of the trial testimony and exhibits. The matter is important, because the primary reason the law limits our scope of review is that the trial judge uniquely (sic) situated, both institutionally and pragmatically, to "smell the smoke of the battle." Here the trial judge was a non-smoker.
Id. at 1265 (quoting Culbreath v. Johnson, 427 So.2d 705, 708 (Miss. 1983).
Omni Bank v. United Southern Bank, 607 So.2d 76 (Miss. 1992), also deals with a case where the chancellor adopted a party's findings of fact and conclusions of law. According to Omni,
[t]he practical premise underlying our limited review of matters of fact is that the trial court heard the testimony and observed the demeanor of witnesses and from this made the tough and necessary credibility choices. That predicate premise does not obtain today, and so we have no choice but to "engage in much more careful analysis of adopting findings than in cases where the findings and conclusions have been authorized by the trial judge himself."
Id. at 83 (quoting Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss. 1987).
The only issues that the trial court truly addressed and authorized were those of *859 visitation and child support.[1] This court should therefore be a little less deferential towards the non-independent findings of the lower court than it normally would be and turn a somewhat jaundiced eye towards the findings of fact that the chancellor borrowed from the plaintiff David Chamblee.

I. THE CHANCELLOR ERRED IN FAILING TO FIND AND HOLD THAT APPELLANT SHEILA CHAMBLEE, WAS ENTITLED TO A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.
"This Court will not reverse a chancellor's decree of divorce unless it is manifestly wrong as to law or fact." Chaffin v. Chaffin, 437 So.2d 384, 386 (Miss. 1983) citing Humber v. Humber, 109 Miss. 216, 68 So. 161 (1915); Dubois v. Dubois, 275 So.2d 100 (Miss. 1973).
According to Mississippi case law, habitual cruel and inhuman treatment as a grounds for divorce must be proved by a preponderance of the credible evidence. Rawson v. Buta, 609 So.2d 426, 431 (Miss. 1992), citing Cooper v. Cooper, 518 So.2d 664, 666 (Miss. 1988). "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." Id., citing Rainey v. Rainey, 205 So.2d 514, 515 (Miss. 1967). Additionally, a causal connection must exist between the treatment and the separation. Rawson at 431, citing Fournet v. Fournet, 481 So.2d 326, 328 (Miss. 1985).
Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985), also provides a useful analysis of this issue. In that case a suit for separate maintenance was filed, the defendant counterclaimed for divorce on the ground of cruel and inhuman treatment, and the court awarded the divorce. In discussing what constituted habitual cruel and inhuman treatment, this Court stated:
We agree, however, that the charge of cruel and inhuman treatment against one spouse means something more than unkindness or rudeness or mere incompatibility or want of affection. It has been said that:
The conduct of the offending spouse must be so unkind as to be cruel, that is, so unreasonably harsh and severe as to be inhumane, so lacking in human qualities, so unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb, or health. And finally, such conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself. Bunkley and Morse, Amis on Divorce and Separation in Mississippi § 3.14(3), at 114 (1957); cited in Burnett v. Burnett, 271 So.2d 90, at 92 (Miss. 1972).
On the other hand, habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse. Bunkley and Morse, Amis on Divorce and Separation in Mississippi § 3.14(8), at 122 (1957).
Kergosien at 1210, quoting Wires v. Wires, 297 So.2d 900, 902 (Miss. 1974).
*860 If Sheila's allegations about David beating her and forcing her to have sex with him against her will had been proven to be true, then a charge of cruel and inhuman treatment would probably have been justified. However, the evidence presented in this case is not such that the chancellor's holding can be said to be manifestly wrong as to law or fact, even if one uses a jaundiced eye.
In Polk v. Polk, 559 So.2d 1048 (Miss. 1990), this Court affirmed a divorce decree in an opinion which stated:
The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts. The issue here was a factual one and the chancellor's decision will not be disturbed since it was not manifestly wrong.
Id. at 1049.
In the case at bar, the only person who actually testified that David treated Sheila in a cruel and inhuman manner was Sheila herself. Pam Wiskus stated that Sheila had bruises on her arms which looked as if someone had been grabbing her but was not able to independently verify that the bruises had been caused by David. In addition, the letter from David to Sheila postmarked May 28, 1991, is so vague that it adds practically nothing to Sheila's case. Finally, David denied every instance of physical abuse that Sheila accused him of. Given the evidence introduced at trial, and the requirement that the accusing party must prove by a preponderance of the credible evidence that the cruel and inhuman activity took place, this court can not say that the chancellor's decision to not grant a divorce based on the grounds of cruel and inhuman treatment was manifestly in error.

II. CUSTODY OF THE MINOR CHILD OF THE PARTIES SHOULD HAVE BEEN AWARDED TO HIS MOTHER, THE APPELLANT.
The scope of review for the issue of custody and other similar domestic relations matters is quite limited.
This court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Bell v. Parker, 563 So.2d 594, 596-597 (Miss. 1990).
In other words, "on appeal (we are) required to respect findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990).
This is particularly true "in the areas of divorce and child support." Nichols v. Tedder, 547 So.2d 766, 781 (Miss. 1989).
Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993); Morrow v. Morrow, 591 So.2d 829, 832-833 (Miss. 1991); Clark v. Myrick, 523 So.2d 79, 80 (Miss. 1988); Culbreath v. Johnson, 427 So.2d 705, 707 (Miss. 1983).
The case of Albright v. Albright, 437 So.2d 1003 (Miss. 1983), provides several useful child custody guidelines. It states that, "the polestar consideration in child custody cases is the best interest and welfare of the child." Id. at 1005. Albright cites as factors to weigh when determining what is in the child's best interest,
(age), health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and the responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Id.
When one applies these standards to the case at bar, it becomes apparent that the decision of the chancellor to award custody to *861 David was not manifest error. Sheila may have presented enough evidence at trial to let one conclude that custody should have been awarded to her but the weight of the evidence for her was not so great as to make an award of custody to David erroneous. Sheila might have won a few rounds in the proper custody match but she did not knock David out. Indeed, Sheila said more than once that David is a good father and that he and Justin are close. Possible shortcomings such as David's low salary and the time he spent away from home when Justin was younger are not so egregious as to force this court to overturn the verdict of the chancellor.
The most serious accusation that Sheila leveled at David was that of his alleged physical abuse of Justin. If David's abuse of Justin had been proved and if it seemed likely that an award of custody would result in further abuse of Justin, then the ruling of the chancellor might well have been manifest error. However, the only real evidence of this abuse that Sheila presented was her own uncorroborated testimony. This evidence is not enough to make the finding of the lower court as to custody manifestly erroneous, even considering that the chancellor borrowed the findings of fact in this area from David Chamblee.
Appellant Sheila attempts to bolster her case for custody by using the "tender years" doctrine. This rule dates back over a century to the case of Johns v. Johns, 57 Miss. 530 (1879), where this court stated, "In all cases where any child is of such tender age as to require the mother's care for its physical welfare it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons." Id. Recent jurisprudence, however, has weakened this doctrine. Cheek v. Ricker, 431 So.2d 1139 (Miss. 1983), states, "it hardly seems rational that the age of a child should per se lead to any particular result." Id., at 1145. Albright similarly holds that the age of the child is but one factor to be considered in determining proper custody. Albright at 1005. Any application in this case of whatever is left of the "tender years" doctrine is insufficient to find that the chancellor's award of custody was manifest error.

III. THE VISITATION RIGHTS OF SHEILA CHAMBLEE GRANTED BY THE CHANCELLOR WERE UNDULY RESTRICTIVE.
According to Newsom v. Newsom, 557 So.2d 511 (Miss. 1990), "The chancellor is charged with the responsibility to protect the children and determine what visitation is in their best interest; great deference is given to the chancellor's decision on these matters." Id. at 517. This sentiment is echoed in Harrell v. Harrell, 231 So.2d 793 (Miss. 1970), a case similar to the one at bar. In that case, Audrey Nell Harrell was granted a divorce from her husband on the grounds of habitual cruel and inhuman treatment. At the time of the trial they had a five-year-old son. The chancellor there limited visitation after the time the child was old enough to enter school to the third Sunday of each month, one week during the summer, and alternate Christmas days.
The trial court enjoys a large amount of discretion in making its determination of what is for the best interest of the child... . Though appellant's argument was ably presented and is persuasive, we are of the opinion that the determination was primarily one for the trial court and we should not disturb it.
Id.
This was one of the chancellor's independent findings so we need not use our jaundiced eye. Accordingly, there is nothing in the record of this case that would indicate that the chancellor's decision was manifestly in error, either as to the facts or to the law. His opinion on this issue should therefore be affirmed.

IV. THE CHANCELLOR ABUSED HIS DISCRETION IN REQUIRING THAT DURING VISITATION WITH THE MINOR CHILD, SHEILA CHAMBLEE SHALL NOT HAVE THE MINOR CHILD IN THE PRESENCE OF ANY MALE COMPANION NOT RELATED TO HER BY BLOOD OR MARRIAGE.
In Cox v. Moulds, 490 So.2d 866 (Miss. 1986), this Court stated that "something *862 approaching actual danger or other substantial detriment to the children" Id. at 868 must be found before a chancellor can place restrictions on visitation. The mere fact that the parent is having an affair is not enough to create the danger requisite to limit visitation. Morrow v. Morrow, 591 So.2d 829 (Miss. 1991), states that "an extramarital relationship is not, per se, an adverse circumstance. Ballard [v. Ballard], 434 So.2d [1357] at 1360 [Miss. 1983] defined the inquiry as ensuring against harm to the child, noting parenthetically, `whether such parental behavior is immoral or not... .'" Morrow, at 833.
David Chamblee points to an incident in which Gary Brashers took Justin for a ride around the block on his motorcycle as creating a sufficient danger to restrict Justin's visitation rights. Although there is some dispute as to whether or not Justin was wearing a helmet during this ride, this single incident does not create a great enough danger to the child to warrant placing restrictions on his visitation with his mother.
Another case, Dunn v. Dunn, 609 So.2d 1277 (Miss. 1992), is analogous to the case at bar. Michael Dunn admitted to having an affair with a co-worker and a divorce was granted on the grounds of adultery. The chancellor limited visitation with Michael so that the children could not be in the presence of the person he was having the affair with. This court stated, "absent any evidence that visitation with Michael and his lover would be harmful to the children, the chancellor erred and abused his discretion in placing such a restriction on Michael's visitation." Id., at 1286.
Furthermore, the chancellor's opinion in the case at bar states that Justin can not be in the presence of "any male companion not related to her by blood or marriage." This is clearly overbroad. Although a danger might conceivably be found as to visitation in the presence of Gary Brashers, the chancellor can't possibly find a danger as to people that Sheila has not yet met. Even keeping in mind that this determination was one of the chancellor's independent findings, such a sweeping restriction constitutes manifest error on the part of the chancellor and should be reversed. Moreover, as there is so little evidence in the record as to any potential threat posed by Gary Brashers, this limitation also constitutes manifest error and should similarly be reversed and remanded for further findings as to the potential dangers to Justin that Gary Brashers might present.

V. THE LOWER COURT'S AWARD DEALING WITH CHILD SUPPORT WAS CLEARLY EXCESSIVE UNDER THE CIRCUMSTANCES.
Guidelines for determining the proper amount of child support a parent must pay are set out in Miss. Code Ann. § 43-19-101. This law must be considered for what it is, a set of guidelines and not absolute rules. Thurman v. Thurman, 559 So.2d 1014 (Miss. 1990), states,
[t]he guidelines for child support awards as now set out in Miss. Code Ann. § 43-19-101 (Supp. 1989) must not control the Chancellor's award of child support.... Rather, this shall be done by a chancellor who hears all the facts, views the witnesses, and is informed at trial of the circumstances of the parties and particularly the circumstances of the children.
Id., at 1017.
The chancellor here followed the guidelines to the letter and awarded the 14% of adjusted gross income that the statute suggests is appropriate for the support of a single child. Miss. Code Ann. § 43-19-101 When one considers the circumstances of the case at bar, especially the fact that Sheila's income at the time of trial was almost triple that of David's, it becomes apparent that the chancellor's use of the guidelines was appropriate and did not constitute manifest error. Sheila simply did not put forth enough evidence to overcome the rebuttable presumption of appropriateness that the statute creates. The chancellor's decision as to this particular issue should therefore be affirmed.

*863 VI. THE CHANCELLOR ERRED IN AWARDING DAVID GLENN CHAMBLEE PERMANENT POSSESSION, CUSTODY AND CONTROL OF THE FORMER MARITAL RESIDENCE OF THE PARTIES AND TEN (10) ACRES OF OTHER LAND.
Appellant Sheila Chamblee proffers several arguments and cites several cases to support the proposition that property is to be equitably divided by the chancellor in a divorce case. This misses the point. This issue does not go to the actual ownership of the property as Sheila Chamblee seems to believe. Rather, it goes to the possession, custody and control of the property. Although we cannot be sure of what the chancellor's intent as to this issue is as he did not himself write this part of the opinion, we can infer from the language the he borrowed that the title in this property is to remain unchanged. The exact words used to describe the interest in the house that was to be transferred to David from Sheila are "permanent possession, custody, and control" and the words used to describe the interest to the ten acres are "permanent exclusive use, possession and control." In regard to other properties he uses the term "ownership". From this it would be safe to read the opinion as keeping the actual ownership in the hands of both parties.
The case of Gray v. Gray, 562 So.2d 79 (Miss. 1990), states that an award to the wife of "sole and exclusive possession, use and control of the home owned by the parties, not subject to partition ... in no way destroys or diminishes (the husband's) interest in the ... property." Id., at 83. The words used to describe the interest transferred in that case are almost identical to the ones used in the case at bar. Sheila still owns whatever part of the house and the land that she owned before the divorce; she has simply lost its possession, custody (or use) and control. Based on the facts of this case, such an award can not be described as manifest error.
Furthermore, when one considers that David has custody of Justin, the award of use and possession of the house was proper. It is preferable that the party who is awarded such custody should also be awarded use of the marital home. Indeed, McIlwain v. McIlwain, 441 So.2d 517 (Miss. 1983), goes so far as stating that a chancellor abused his discretion by awarding the marital home to the party which did not receive custody of the couple's two children.
Use, possession, and control of property is not without value. A more equitable ruling might have been to award possession and control to David and have him pay a reasonable rent for the use of the property to Sheila. Nevertheless, the fact that he did not structure the award in this way does not make his ruling rise to the level of a manifest error. The chancellor's findings as to this issue should therefore be affirmed.

VII. THE CHANCELLOR ERRED IN AWARDING DAVID CHAMBLEE OWNERSHIP OF THE FOLLOWING ASSETS OF THE PARTIES:

LEGG MASON IRA $ 55.00
WASHINGTON MUTUAL IRA $ 6,124.00
CARTHAGE BANK IRA # 14,421 $ 14,661.00
PANHANDLE EASTERN STOCK $ 10,476.00
CARTHAGE BANK IRA # 14,954 $ 14,642.00
1989 VAN $ 9,500.00
WAL-MART STOCK $ 10,775.00
CD # 16,221 $ 27,262.00

In recent years, this court has been moving away from using divorce proceedings as a means of punishing the party adjudged to be at fault towards creating a more fair and equitable jurisprudence of divorce law. This trend can be seen in the area of child custody in the many non-fault based factors listed in Albright. Furthermore, Moak v. Moak, 631 So.2d 196 (Miss. 1994), states specifically that "child custody decisions are to be made in the best interests of the children, rather than as a punishment." Id. at 200. Alimony is likewise not to be used as a punishment. Tilley v. Tilley, 610 So.2d 348, 354 (Miss. 1992). In view of the recent case law, it seems likely that this court must use a similar attitude of equity and non-punishment towards the division of marital property.
One must bear in mind, however, that an equitable division of property does *864 not necessarily mean an equal division of property. Mississippi is not a community property state. Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986); Rives v. Rives, 416 So.2d 653, 657 (Miss. 1982). This point cannot be stressed enough. The community property system and Mississippi's system of equitable division are crucially different. Under the law of community property,
[a]lthough it is the duty of each spouse to contribute his or her industry, energy and intelligence to the community, with respect to the right of either to equal participation in such gains and acquisitions as become community property, the question of how much the other party may have contributed toward their production is immaterial. Thus, neither idleness, wasteful habits, nor physical incapacity will deprive the wife of her share in the acquets and gains. 15A Am.Jur.2d Community Property § 6 (1976).
Under such a system the court is not permitted to look at the history of the marriage and the actions of the married couple to determine what would constitute a fair division of property. The law instead requires a 50-50 split of all marital property, half to her and half to him, regardless of their respective contributions. The potential abuses of community property are obvious  a spouse who spends ten years of a marriage idly sitting on the couch watching television while their partner maintains a job and takes care of the house would be entitled to half of the property accumulated by the working partner during the marriage.
In Mississippi under the system of equitable division, the court is not so constrained. "The matter rather is committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances." Brown v. Brown, 574 So.2d 688, 691 (Miss. 1990). In the above scenario a Mississippi chancellor would be able to avoid the unjust result that community property law would dictate by examining the history of the marriage, weighing the relative contributions of each spouse, and, after such an analysis, crafting a property settlement which accurately reflects the contributions of both to the marriage.
The contrast between community property and equitable division is clear: in the former one must conform to a strict intransigent rule which has little consideration for the realities of each individual case while in the latter one has the flexibility to do what equity and justice requires. It is the opinion of this court that the rule of equitable division is the better rule and the rule that Mississippi should continue to maintain.
Brown shows that the discretion of the chancellor in this area is quite broad. However, certain procedures must be followed when making a proper determination of the division of property. Johnson v. Johnson, 550 So.2d 416 (Miss. 1989), provides a useful summary of the chancellor's power to determine property divisions and the proper technique for doing so.
The Chancery Court certainly has the authority to order an equitable division of jointly accumulated property and in doing so to look behind the formal state of title. See, e.g., Jones v. Jones, 532 So.2d 574, 579-81 (Miss. 1988); Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987); Spearman v. Spearman; 471 So.2d 1204, 1205-06 (Miss. 1985); Watts v. Watts, 466 So.2d 889, 890-91 (Miss. 1985). The Court seeks equity by reference to the economic contribution made by each to the acquisition and maintenance of the property Regan v. Regan, 507 So.2d at 56; Pickle v. Pickle, 476 So.2d 32, 34 (Miss. 1985), and in doing so has no authority to disregard a spouse's economic contributions just because they were not monetary in form.
Id., at 420.
Johnson further develops the concept of economic contributions by quoting Pickens v. Pickens, 490 So.2d 872 (Miss. 1986).
Service and in kind contributions have an economic value as real as cash contributions. In such situations, where one party to the relationship acts without compensation to perform work or render services to a business enterprise or performs work or services generally regarded as domestic in nature, these are nevertheless economic contributions. They are to be valued by *865 reference to the cost of similar services in the marketplace.
Id., at 420.
These cases reveal that a primary consideration in providing for a proper division of property is the economic contributions made by each party into the marriage, whether it be in terms of actual money earned or in terms of service without compensation.
The case at bar features a couple who have each over a period of several years donated great amounts of money and non-compensated time to the marriage. At the time of the separation they were both working and earning roughly equivalent salaries. Furthermore, aside for some periods of unemployment on David's part, both had worked for the entirety of the marriage. It also is apparent that both contributed various amounts of non-paid services such as child care and domestic work to the marriage as well. Yet somehow, the chancellor saw fit to award to David every item of marital property that the parties contested.
Among such contested properties that were awarded to David were a Legg Mason IRA account valued at $55.00, a Washington Mutual IRA valued at $6,124, two Carthage Bank IRA's valued at a total of $29,303, a Certificate of Deposit valued at $27,262, a 1989 van valued at $9,500, Panhandle Eastern Stock valued at $10,476, and Wal-Mart stock valued at $10,775. The total value of contested property awarded to David was $93,495. The only property that the court granted Sheila was property that David made no claims to. This consisted of one retirement account whose value was not revealed in the record, four acres of land in Leake County that Sheila acquired in a previous marriage, and other personal property that was already in Sheila's possession.
It is difficult to understand how the chancellor arrived at this decision as this was another issue where he adopted David's findings of fact and conclusions of law. That aside, even if one keeps in mind the great discretion granted chancellors in such matters, the decision of the lower court must be seen as manifest error.
From the record of this case it is difficult to determine whether a complete evaluation of the contributions of both spouses to the marriage took place. Johnson and cases like it mandate that these factors must be fully considered before a decision as to the proper property division can be made. Therefore, this court reverses the decision of the chancellor and remand this case for further findings of fact on this issue. Furthermore, as the Jones and Regan line of cases permit the chancellor to look beyond the property's title to determine who should rightfully be awarded the property, the proper ownership of all of the contested properties listed under this point of error including those listed in David's name only, should be reconsidered on review.

VIII. THE CHANCELLOR ERRED IN REQUIRING THAT SHEILA CHAMBLEE PAY DAVID CHAMBLEE'S ATTORNEY'S FEES IN THE AMOUNT OF TWENTY-FIVE THOUSAND ONE HUNDRED TWENTY-FOUR DOLLARS AND SEVENTY-EIGHT CENTS ($25,124.78).

IX. THE CHANCELLOR ERRED IN REQUIRING THAT SHEILA ROZINA PHILLIPS CHAMBLEE PAY ALL COSTS OF THIS ACTION.
"Generally the award of attorney's fees in a divorce case is left to the discretion of the trial court." Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988). However, "if a party is financially able to pay her attorney, an award of attorney's fees is not appropriate... . Likewise, that rule applies to court costs." Martin v. Martin, 566 So.2d 704 (Miss. 1990).
In the case at bar, the chancellor awarded David over $93,000 worth of contested property and then allowed him over $25,000 in attorney's fees. As David was more than able to pay both his attorney's fees and court costs out of the proceeds from this property award, Sheila should not be made to pay them. The grant of attorney's *866 fees and court costs was therefore manifest error and should be reversed.
As this case is to be remanded on the issue of property division, these two issues should be remanded as well. After the property in question is redivided, a new evaluation of the parties' relative ability to pay can be made and any appropriate awards of attorney's fees and court costs can then be granted.

X. THE CHANCELLOR'S REFUSAL TO ALLOW COUNSEL FOR APPELLANT TO READ INTO THE COURT RECORD HIS ATTORNEY'S FEES IN ORDER TO ESTABLISH THE NECESSITY OF SAID ATTORNEY'S FEES AND THE REASONABLENESS OF SAME WAS CLEARLY ERRONEOUS.
The chancellor's not reopening the case to allow counsel for Sheila Chamblee to enter evidence of their attorney's fees may have been an error. However, no objection was raised at trial and this point was not cited in Sheila's Designation of Record and Statement of Issues. Nevertheless, the fact that counsel did not raise this issue below does not preclude this court from considering it now. Supreme Court Rule 28(a)(3) states that this court may notice a plain error not identified or distinctly specified. According to Johnson v. Fargo, 604 So.2d 306 (Miss. 1992),
Under this court's standard of review ... the Court retains the inherent authority to notice error, despite trial counsel's failure to preserve the error. The Fifth Circuit Court of Appeals addressed this aspect of appellate authority in Edwards v. Sears, Roebuck and Co., 512 F.2d 276 (5th Cir. [Miss.] 1975), in the context of improper closing argument:
[Counsel accused of improper argument] maintains that since much of the argument was not objected to, this court cannot consider the error on appeal. This misconstrues the court's prerogatives on review  we always possess the power to consider errors to which no objection was made. But a healthy regard for the necessity and desirability of having errors corrected at trial rather than on appeal leads us to exercise that power only where the interest of substantial justice is at stake.
Johnson, at 311 (citations omitted).
The issue of attorney's fees, although not insignificant, is not one "where the interest of substantial justice is at stake." Therefore, this court should not consider this issue on appeal, and the decision of the lower court on this point should be affirmed.
Some of the lower court's holdings that appellant Sheila Chamblee cites as being erroneously decided, should be affirmed while others should be reversed and remanded for further findings. Due to a lack of credible evidence to the contrary, the chancellor's decision to not grant Sheila Chamblee a divorce based on habitual cruel and inhuman treatment can not be said to constitute manifest error. The same can be said about his decision to grant custody of Justin Chamblee to David, the visitation schedule and child support arrangement that he imposed on Sheila, and the awarding of the use and possession of both the former marital home and the ten acres in Leake County.
However, as virtually no evidence was presented at trial that would constitute a finding that Justin's visiting Sheila in the presence of any male companion not related to her by blood or marriage would be harmful to the child, the chancellor's decision on this point constitutes manifest error and should be reversed and remanded. Furthermore, as both spouses contributed money and non-compensated time to the marriage, the chancellor's decision to award virtually all of the marital property to David should also be reversed and remanded. In addition, as David was capable of paying his own attorney's fees and costs, the chancellors' decision to make Sheila pay them should be reversed and remanded for redetermination after the couple's property is redistributed. Finally, as counsel for Sheila Chamblee failed to object to the chancellors' refusal to allow evidence of his attorney's fees into the record and as this issue is not of the type that this court should address as plain error, the chancellors' decision on this point should be affirmed.
*867 AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
NOTES
[1] The part of the chancellor's order which he wrote himself reads as follows:

The parties through their attorneys in due course have presented (Findings of Fact and Conclusions of Law) to the Court for its consideration and after careful review the Court does hereby accept as its own the Findings of Fact and Conclusions of Law of the Plaintiff which are attached hereto and made a part of this opinion. However, the Court is going to award the Defendant the right of reasonable visitation with the minor child of the parties of at least the 1st and 3rd weekends of every month beginning at 5:00 p.m. on Friday and ending at 5:00 p.m. on the following Sunday and at least (2) weeks during the summer months so as not to interfere with any school function or regular scheduled summer activities such as baseball, soccer and regular scheduled organized summer team programs provided, however, that when the Defendant has visitation she is not to have the minor child in the presence of any male companion not related to her by blood or marriage.
In addition the Court is going to direct that the Defendant pay unto the Plaintiff as child support 14% of her adjusted gross income as provided by statute and to maintain health insurance coverage on the minor child and furnish the Plaintiff evidence of such coverage.
In addition to the above mentioned visitation the parties may agree on any additional visitation.