**IN THE SUPREME COURT OF MISSISSIPPI**
**NO. 2000-CA-01461-SCT**

*TAMMY DEAN MORRIS*

*v.*

*ROBERT TIMOTHY MORRIS*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/10/2000 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | LANDMAN TELLER, JR. |
| ATTORNEYS FOR APPELLEE: | J. MACK VARNER |
| | LEE DAVIS THAMES, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 01/10/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/31/2002 |

**BEFORE SMITH, P.J., COBB AND DIAZ, JJ.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. After nine years of marriage, Tammy Dean Morris ("Tammy") sought a divorce from her husband, Robert Timothy Morris ("Tim"), in the Warren County Chancery Court on grounds of habitual cruel and inhuman treatment, or, in the alternative, irreconcilable differences. In his answer, Tim denied that the divorce should be granted and counterclaimed for custody of the couple's minor child. Chancellor Vicki R. Barnes denied Tammy's complaint for divorce. Tammy appeals to this Court from the chancellor's decree, assigning as error the chancellor's finding that the evidence presented was insufficient to prove habitual cruel and inhuman treatment.

## FACTS

¶2. Tim and Tammy were married on October 19, 1988. Dean Logan Morris, the one child produced by this marriage, was born in 1990. Tammy was employed as a medical lab technician until Dean's birth and then worked outside the home, intermittently, after Dean began school. Tim is a physician. The marital home is located in Vicksburg, Mississippi.

¶3. By all accounts, Tim and Tammy were happily married until 1990. At that time, Tim allegedly became emotionally unsupportive, verbally abusive, and controlling. Tammy was diagnosed in February 1997 with obsessive compulsive disorder and depression, which she attributes to Tim's behavior. The couple separated on June 1, 1997, when Tammy moved out of the marital home. Tammy admits to having a sexual relationship with a third party, Vance Jensen, subsequent to moving out of the marital home, which continued, intermittently, until the time of the hearing.

¶4. Tammy claims that she suffered emotional trauma inflicted by Tim. Though she testified to two episodes

of violence, one in which Tim pushed her to the ground causing bruises on her arm and leg and another in which Tim struck Vance Jensen, she acknowledged that Tim had never physically abused her. She contends that she became depressed as a result of emotional abuse inflicted by Tim and that she moved out of the marital home in order to save her health.

¶5. On April 1, 1998, Tammy filed a complaint for divorce in the Chancery Court of Warren County. Tim filed his answer on May 20, 1998, in which he denied that the divorce should be granted and counterclaimed for custody of Dean. On December 20, 1999, an agreed order bifurcating trial was entered to enable the court to proceed on the issue of whether a divorce should be granted prior to addressing issues of support and custody. The three-day hearing on the issue of divorce began December 16, 1999, and the chancellor entered her Memorandum Opinion and Order denying the divorce on February 10, 2000. The chancellor subsequently denied Tammy's Motion to Reconsider on April 4, 2000, and Tammy appealed to this Court on April 17, 2000. She raises the following issue for review:

**WHETHER THE CHANCELLOR ERRED IN FINDING THERE WAS INSUFFICIENT EVIDENCE TO PROVE HABITUAL CRUEL AND INHUMAN TREATMENT.**

## STANDARD OF REVIEW

¶6. Our scope of review in domestic relations matters is limited. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Steen v. Steen*, 641 So. 2d 1167, 1169 (Miss. 1994) (quoting *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990)). Findings of fact supported by credible evidence and not manifestly wrong must be respected on appeal. *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990). "This is particularly true 'in the areas of divorce and child support.'" *Steen*, 641 So. 2d at 1169-70 (quoting *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989)).

## DISCUSSION

¶7. Tammy claims that her proof was sufficient to establish by a preponderance of the evidence that she was entitled to a divorce from Tim on the grounds of habitual cruel and inhuman treatment. Upon thorough examination of the record, this Court finds that there was not sufficient evidence of such treatment, as it has been defined and constrained by this Court's interpretation of the statutory meaning. Therefore, the chancellor's determination is affirmed.

¶8. This Court has consistently held that "habitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said a permanent condition." *Wilson v. Wilson*, 547 So. 2d 803, 805 (Miss. 1989). "Our cases require more than mere unkindness, rudeness, or incompatibility." *Brooks v. Brooks*, 652 So. 2d 1113, 1124 (Miss. 1995). "[T]here must be proof of systematic and continuous behavior on the part of the offending spouse which goes beyond mere incompatibility." *Parker v. Parker*, 519 So. 2d 1232, 1234 (Miss. 1988). "We have counseled against the awarding of a divorce on the grounds of habitual cruel and inhuman treatment where the lawsuit is based merely 'on petty indignities, frivolous quarrels, general incompatibility and the petulant temper of one or both parties.'" *Steen*, 641 So. 2d at 1170 (quoting *Howard v. Howard*, 243 Miss. 301, 303-04, 138 So. 2d 292, 293 (1962)).

¶9. The facts alleged by Tammy as constituting habitual cruel and inhuman treatment are as follows. According to Tammy, Tim was emotionally unsupportive when her close friend died of AIDS in 1991 and when her father died of cancer in 1992. Tim testified that he felt he was fully supportive and that Tammy never told him that she felt that he was unsupportive. Tammy testified that Tim made her feel guilty when he told her he felt neglected by her leaving home at one week intervals over a period of a year in order to spend time with her family after her father was diagnosed with cancer. Tim made Tammy feel that it was inconvenient for her family of ten, not to mention their three dogs, to stay at the house during the Christmas holidays of 1991. Tammy testified Tim attempted to control her life by repeatedly asking her to change her plans at the last minute, and that this made her feel guilty and made it difficult for her "to go and have a good time." It is clear from the record, however, that Tammy had an extensive social life outside and inside the marital home, and that Tim rarely, if ever, curtailed the time she spent with friends or the frequency with which she entertained in the home.

¶10. Tammy testified that Tim went to Florida on Valentine's weekend of 1993 to visit a college friend, Tammy Peoples. Tim testified that he never visited Tammy Peoples without Tammy and Dean. Tammy also complained that on two occasions, Tim stayed out all night and did not call home.

¶11. When Tammy went back to work as a medical lab technician in 1993, Tim commented on the size of her paycheck and that her working was an inconvenience for the family. Tim testified that he supported Tammy's desire to work, though he would have preferred her not work outside the home. Tammy's testimony indicated that Tim was agreeable when she wanted to return to work. Tammy also testified that Tim supported her by helping her invest in a coffee shop, but made her feel that it was inconvenient for her to work at the coffee shop on weekends until 2 a.m. She also complained that he insisted on decorating the coffee shop. Tim asked Tammy not to have a drink with her ex-boyfriend, Steve Shoto, to discuss Steve's marital problems. When Tammy drove to Jackson to have a drink with Steve, Tim made her feel guilty by calling her a "sorry wife" and telling her to come home even though she was intoxicated. Tim became angry when Tammy would pick up his things around the house. Tim would not eat Tammy's cooking. He did not compliment her yard work.

¶12. The couple's sexual relationship deteriorated. Tammy testified that Tim suggested that her lack of sexual desire was due to the fact that she might be a lesbian, referring to Tammy's one-time sexual encounter with another female prior to their marriage. She also stated that Tim repeatedly reminded her of the fact that she had an abortion prior to their marriage. Tim denied ever mentioning the lesbian affair to Tammy, but admitted to wondering aloud to Tammy what David Minchew, the man with whom she had the abortion, thought of when he looked at Dean. According to the record, Minchew had begun spending two to three weekends each month at the marital home after Tammy, admittedly, encouraged Minchew to leave his own wife. Tim testified that he made the comment to Tammy about the abortion after she began spending long hours on the phone with Minchew and after she began spending time with Minchew in the guestroom when he would stay at the house on weekends.

¶13. Tammy testified that Tim often yelled at her and called her derogatory names. Tim testified that the couple argued, but that he never verbally abused Tammy. Two incidents complained of by Tammy were corroborated by third-party testimony. On one occasion, Tim allegedly told Tammy to "get off her fat a__" when he arrived home from work and she was drinking in the house with her friend, Katrina Davis. On another occasion, after the separation, Tim told Mike Allred, Tammy's friend, that he should "just let Tammy go kill herself." Florence Dean, Tammy's mother, testified that Tim yelled frequently and was

controlling.

¶14. Tammy became visibly depressed late in 1996. Tammy asked Tim to prescribe Prozac for her, which he did, but he gave her no comfort, which, according to Tammy, was what she really needed. Tim persuaded Tammy to seek psychiatric treatment with Dr. Sharon Pugh in January 1997. Tammy testified that Tim made her feel guilty about the amount of money Dr. Pugh charged, but she also stated that Tim never attempted to prevent her from seeing Dr. Pugh and that she did so as long as she desired. Dr. Pugh diagnosed Tammy with "major depression" and obsessive compulsive disorder. Tammy testified that the symptoms of the obsessive compulsive disorder were excessive hand-washing, anxiety, low self-esteem, and insecurity. She apparently does not attribute the obsessive compulsive disorder to Tim, only the depression.

¶15. It is clear from Dr. Pugh's notes from her sessions with Tammy that Tammy suffered from low self-esteem and that she felt Tim was overly controlling, unreasonable, self-centered, and verbally abusive. Dr. Pugh's notes refer to Tim as narcissistic and abusive. It is clear from the record, however, that at the time these notes were made, Dr. Pugh had never met with Tim and that her notes are solely from the information supplied to her by Tammy.

¶16. Tim agreed to see Dr. Pugh as well and met with her on two occasions prior to the separation. The notes from Dr. Pugh's joint session with Tim and Tammy state as follows:

> Tammy was accompanied to the therapy session by her husband, Doctor Tim Morris. Tammy appeared strong and assertive during this session. Tim appeared euphoric with regard to their reconciling and "a Revelation from God." Tim appeared somewhat extreme with his focus on religiosity but reality-based. This appears to be his way of dealing with this crisis in his life. He is motivated to do whatever it takes to reconcile their marriage. The issues continue to include Tim being controlling and making critical statements of his wife. Tammy is more aware of this communication problem and is working to confront it. Tim rejects continuing therapy with me as he wants to pursue a Christian counselor from a church in his hometown.

Tim testified he told Dr. Pugh he had a controlling and passive-aggressive personality. Tammy complained that Tim was unsupportive of the counseling sessions in that he refused to return for more sessions with Dr. Pugh. The record indicates, however, that Tim returned for at least ten sessions with Dr. Pugh.

¶17. Tammy left the marital home on June 1, 1997. She testified that she was forced to do so to save her health and that if she ever went back she "might even die." Tim testified that Tammy told him she was leaving in order to "find herself" and make herself stronger for their marriage. He testified that he never wanted Tammy to leave and that he still wanted her to come home. Tim testified Tammy did not begin telling him he was trying to control her until two months before she moved out.

¶18. The record indicates that Tammy withdrew $1400 cash from the couple's checking account two months prior to leaving the marital home. Shortly after Tammy left, Tim closed the checking account and cancelled all but one credit card. Tim paid three months of rent for Tammy, all utility deposits, YMCA dues in the amount of $340, and all of Dean's tuition for 1997 and half thereafter. Tammy and Dean remained covered under the family medical/dental insurance. Tim referred to closing the checking account and destroying the credit cards as "damage control."

¶19. Shortly after Tammy separated from Tim, she began a sexual relationship with Vance Jensen. Tammy testified that Tim, on two occasions, brought Dean to her apartment so that he could "catch her" with Jensen in Dean's presence. Tim denied having such an ulterior motive. Tammy testified that on their ninth wedding anniversary, Tim found her car outside Jensen's apartment and moved the car to the marital home. Tim later returned the car to Tammy, with her wedding dress inside. Tammy also testified that Tim once hit Jensen with a brick fragment in his hand and told Jensen to "stay away from his family." Tammy also complained that Tim unilaterally cancelled Dean's baptism, which was scheduled for the following day. Tim testified that he did so because he felt hypocritical dedicating his son to the Lord the day after he beat up his wife's boyfriend.

¶20. The chancellor's forty-three page opinion contains extensive findings of fact. Though the chancellor's opinion contains several pages of discussion regarding Dr. Pugh's diagnosis of Tammy's depression and Tammy's progress with treatment, Tammy argues that the chancellor failed to recognize the severity of the depression, and that the severity itself warrants that the divorce should have been granted. She relies on *Chamblee v. Chamblee*, 637 So. 2d 850 (Miss. 1994), in which this Court stated that "habitual ill-founded accusations, threats or malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse." *Id.* at 859 (quoting *Kergosien v. Kergosien*, 471 So. 2d 1206, 1210 (Miss. 1985)). This Court has explained that the cruelty required must be "so gross, unfeeling and brutal as to render further cohabitation impossible except at the risk of life, limb or health on the part of the unoffending spouse." *Howard v. Howard*, 243 Miss. 301, 303-04, 138 So. 2d 292, 293 (1962). It is the opinion of this Court that the chancellor correctly concluded that Tim's conduct did not rise to this level. Also, it is clear from Dr. Pugh's medical notes in the months prior to Tammy's separation from her husband that Tammy's condition was improving and that her prognosis was "improving" and "good."

¶21. Tammy also relies on this Court's opinion in *Robison v. Robison*, 722 So. 2d 601 (Miss. 1988), in which this Court affirmed the chancellor's finding of habitual cruel and inhuman treatment. *Robison* is clearly distinguishable from the case sub judice. The evidence of verbal and emotional abuse presented by Ms. Robison went uncontradicted by her husband. *Id.* at 603. Ms. Robison testified that her husband told her he could not stand to be around her and that there was nothing she could do to make herself desirable to him, that he kept late hours and talked about having to engage in sexual relations with women at work to advance his career. *Id.* When the Robisons did, occasionally, have sex, Mr. Robison threw her off the bed. *Id.* Mr. Robison continually criticized his wife's appearance, never took her anywhere, and showed absolutely no affection. *Id.* Mr. Robison restricted his wife's social life to the point of telling her who she could be friends with and where and under what circumstances she could go anywhere. *Id.* Mr. Robison began an adulterous relationship, left his family, and neglected them to the point that they could not afford groceries and friends had to hold a food drive. *Id.* The facts of this case, many of which are contradicted, simply do not rise to the level presented in *Robison*.

¶22. It cannot be said that the chancellor was manifestly in error in finding that Tammy failed to demonstrate cruelty and inhuman treatment as those terms have been defined by the decisions of this Court. Rather, her proof demonstrated the lack of communication, incompatibility, indignities, and intense quarreling alluded to above. No doubt, Tammy at least believed that she was the object of much criticism on the part of her husband and that he was overly controlling. This Court has held, however, that such conduct does not fulfill the requirements of a divorce on the grounds of habitual cruel and inhuman treatment. *Steen*, 641 So. 2d at 1170.

¶23. In the similar case of ***Talbert v. Talbert***, 759 So. 2d 1105 (Miss. 1999), this Court, holding that the facts did not meet the standard for cruel and inhuman treatment, stated:

> The chancellor relied upon Mr. Talbert's raising his voice to Mrs. Talbert, belittling her, and a few acts of violence very early in the twenty-seven-year marriage. The record indicates that Mr. Talbert exhibited insensitive and somewhat boorish, obnoxious, and selfish behavior throughout the period of the marriage, but again, the fact that one spouse eventually grows weary of the other's established behavior pattern does not give rise to the requisite standard for habitual cruel and inhuman treatment.... The fact that Mr. Talbert may be insensitive does not amount to proof of habitual cruel and inhuman treatment.

*Id.* at 1109. Furthermore, many of Tammy's accusations were denied by Tim. In ***Chamblee v. Chamblee***, 637 So. 2d 850 (Miss. 1994), this Court affirmed a chancellor's finding that the appellant was not entitled to a divorce on the grounds of habitual cruel and inhuman treatment, stating:

> The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts. The issue here was a factual one and the chancellor's decision will not be disturbed since it was not manifestly wrong.

*Id.* at 860 (quoting ***Polk v. Polk***, 559 So. 2d 1048 (Miss. 1990)). In the case at bar, as in ***Chamblee***, the only person who actually testified that Tim treated Tammy in a cruel and inhuman manner was Tammy herself. Though Katrina Davis and Mike Allred confirmed two separate, isolated incidents of Tim's behavior, neither in and of themselves rises to the level or continuity of conduct required by this Court's interpretation of cruel and inhuman treatment.

## CONCLUSION

¶24. Without belittling Tammy's unhappiness with her marriage, given the evidence introduced at trial, and the requirement that the accusing party must prove by a preponderance of the credible evidence that habitual cruel and inhuman activity took place, this Court cannot find that the chancellor's decision to not grant a divorce based on the grounds of cruel and inhuman treatment was manifestly in error. Therefore, the judgment of the chancery court is affirmed.

¶25. **AFFIRMED.**

**PITTMAN, C.J., McRAE, P.J., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.**