GRIFFIS, J.,
Dissenting.
¶ 59. The question before us is whether Rachel Jones established the ground for divorce of habitual cruel and inhuman treatment.[11] The chancellor found that the cumulative effect of the husband’s behavior was sufficient to establish the ground of habitual cruel and inhuman treatment. The majority agrees. Based on my reading of the supreme court precedent, I cannot agree with the majority’s holding; therefore, I dissent.
¶ 60. A crucial fact to my decision is that Rachel and Steven Jones were married twice. They first married in 1991 and divorced the following year. They remarried on December 18, 1995. They remained married for twelve more years. Rachel admitted that Steven’s conduct, which was the basis for the chancellor’s finding, had continued throughout their marriage and was the reason for their first divorce. Thus, Rachel knew of Steven’s conduct, which she now complains is the basis for a divorce, since the beginning of their relationship. She testified that he promised her that he would change, but he did not. In light of the fact that she knew of Steven’s behavior before she married him the second time, I cannot find that the facts presented establish a basis for divorce under the ground of habitual cruel and inhuman treatment.
*486 ¶ 61. In Talbert v. Talbert, 759 So.2d 1105, 1109 (¶¶ 9-10) (Miss.1999), the supreme court held:
We agree with the Court of Appeals[’] dissent that the facts in this case do not meet the standard for habitual cruel and inhuman treatment. The chancellor relied upon Mr. Talbert’s raising his voice to Mrs. Talbert, belittling her, and a few acts of violence very early in the twenty-seven-year marriage. The record indicates that Mr. Talbert exhibited insensitive and somewhat boorish, obnoxious, and selfish behavior throughout the period of the marriage, but again, the fact that one spouse eventually grows weary of the other’s established behavior pattern does not give rise to the requisite standard for habitual cruel and inhuman treatment. Furthermore, Mr. Tal-bert put on proof of Mrs. Talbert’s mental instability, recurring unsubstantiated accusations of infidelity, ridicule of his lack of sexual prowess, blame of the separation on his lay off and the subsequent lack of income, and Mrs. Talbert’s own temper and aggressive behavior. Mrs. Talbert reciprocated Mr. Talbert’s conduct, as evidenced by the psychologist’s testimony that both spouses exhibited “violent outbursts” and screamed at each other equally. The psychologist also stated that Mrs. Talbert was sometimes more aggressive than Mr. Talbert. These facts do not show endangerment to “life, limb or health” or reasonable fear thereof, or such “unnatural and infamous” conduct as to make the marriage revolting. The fact that Mr. Tal-bert may be insensitive does not amount to proof of habitual cruel and inhuman treatment. Nor could the conduct complained of be reasonably labeled “systematic and continuous.” The Talberts’ unpleasant marriage may be beyond repair, but the trial court erred in granting Mrs. Talbert a divorce on [the] ground[ ] of habitual cruel and inhuman treatment without sufficient proof to support her claim. We reverse the trial court’s judgment and the Court of Ap-pealsf] affirmance of this issue, and we render judgment in favor of Mr. Talbert on Mrs. Talbert’s claim of habitual cruel and inhuman treatment.
(Emphasis added). Such is the case here.
¶ 62. After three days of trial, I expected the record to contain evidence of specific instances of Steven’s behavior. It does not. The record contains mainly general statements and descriptions. Rachel testified that Steven’s “degrading sexual behaviors, controlling, manipulation, criticizing, put-downs, and yelling,” in addition to Steven’s gambling addiction, led to the parties’ separation in 2004. The supreme court has held that more is required “than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the ground of cruel and inhuman treatment.” Robison v. Robison, 722 So.2d 601, 603(¶ 5) (Miss.1998).
¶ 63. I first look at the sexual behavior that Rachel argues was degrading. Rachel claims Steven was addicted to sex, and he wanted to have sex often. He also wanted to engage in oral and anal sex. Rachel testified that when they would initiate sex, Steven would ask and encourage her to perform oral sex on him. Rachel apparently performed oral sex on Steven and subsequently argued that this was disgusting and degrading to her. There was no testimony as to how often this occurred, when it last occurred, or whether they ever had sex without beginning with oral sex. There was no evidence that the parties engaged in anal sex. Indeed, the record appears to indicate that Rachel refused this type of sexual behavior, and they never engaged in anal sex. The record goes no further than general descrip *487 tions of their sexual behavior. It is clear that Steven liked having sexual relations with Rachel more than Rachel liked having sexual relations with Steven. Nevertheless, by Rachel’s admission, they engaged in sex approximately three times a week.
¶ 64. Rachel does not allege that Steven forced her to perform oral or anal sex. There was no allegation of violence or a threat of violence that forced Rachel to engage in sex. The only conclusion that I can reach from this evidence is that the parties’ sexual relationship was completely consensual. Rachel may have reluctantly engaged in oral sex, but there is no doubt that it was consensual. She apparently stood by her refusal to have anal sex, but she but would habitually give in to Steven’s persistence in her performing oral sex. The parties disagreed on how much they would have sex and what sexual acts would be permissible. Steven did not violate any criminal sex offenses. There was no evidence that he raped or sexually battered Rachel. There were no allegations of domestic violence. Despite Steven’s whining, complaining, coercive and boorish behavior, Rachel consented to each and every sexual act in their marriage.
¶ 65. I find no authority, nor does the majority, for the conclusion that the performance of oral sex is “such ‘unnatural and infamous’ conduct as to make the marriage revolting.” See Talbert, 759 So.2d at 1109(¶ 10). There was no evidence to show Steven’s alleged aberrant sexual behavior, i.e. oral sex, changed from the time of their first and second marriage. Rachel’s testimony indicates that it did not, she just became tired of it.
¶ 66. There was no evidence of physical violence by Steven. The only physical altercation during the marriage was when Rachel hit Steven. The record does not contain any evidence that Steven ever physically threatened or hurt Rachel. Thus, I cannot conclude that Steven endangered Rachel’s life or limb.
¶ 67. As to her health, Rachel admitted that she was in good health and takes no prescription medication. Rachel had no diagnosed physical or mental health problems for which she receives treatment. Rachel had not been prescribed any medication for depression, anxiety, or other similar medical condition in the last five years.
¶68.' In October 2006, Rachel sought counseling with therapist Dr. Ruth Glaze. Rachel told Dr. Glaze that she was in the process of seeking a divorce and needed some help getting through it. Rachel stated that the reason she was pursuing a divorce was because Steven was manipulative and abusive. Rachel reported no physical problems to Dr. Glaze.
¶ 69. Dr. Glaze testified that she observed signs of mild to moderate depression, anxiety, and confusion in Rachel. She further stated that Rachel was mentally exhausted because she would not know “when someone was going to offend [Steven] and he would rage, [or] when he would guilt her, [or] when bills — when the gambling issue would flare its head, all of the things like that that threatened the very foundation of the home.” Rachel also had trouble eating and sleeping during the time period of her treatment with Dr. Glaze. Finally, Dr. Glaze opined that Rachel should divorce Steven so Rachel could move on with her life.
¶ 70. On cross-examination, Dr. Glaze was asked to define “mental abuse” relative to Rachel’s diagnosis, and she stated that Rachel was “treated less than respectfully, less than an equal.” When Rachel was asked to give a specific example of Steven’s mental abuse, she stated that Steven repeatedly ridiculed her choice of clothing for church. Dr. Glaze’s definition *488 falls far short of the supreme court’s requirement to establish habitual cruel and inhuman treatment as a ground for divorce.
¶ 71. Rachel was never referred to a psychiatrist or a psychologist and does not take any medication for depression or any other mental health reason. In fact, Rachel takes no prescription medication at all. Rachel testified at trial that she was in good health.
¶ 72. While Rachel claimed that Steven’s conduct resulted in her stomach problems, for which she takes over-the-counter medication, there was evidence that she has had these problems for many years. Her sister testified that many other members of her family suffer from the same ailment. There was no evidence to corroborate that her stomach problems were caused by her marital problems or Steven’s conduct.[12]
¶ 73. The time frame for the weight loss was about the same time she started seeing Dr. Glaze. Her testimony does not clarify whether Steven’s actions caused her weight loss or whether the stress associated with Rachel’s decision to seek a divorce caused the weight loss. There was no evidence to corroborate that her weight loss was caused by her marital problems or Steven’s conduct.
¶ 74. I cannot find sufficient evidence to establish the ground of habitual cruel and inhuman treatment because the conduct of Steven “endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for” Rachel. Kumar, 976 So.2d at 961 (¶ 15).
¶ 75. Next, I consider whether the evidence established that the conduct of Steven “is so unnatural and infamous as to make the marriage revolting to [Rachel] and render it impossible for [her] to discharge the duties of marriage, thus destroying the basis for its continuance.” Id. Having already discussed the parties sexual habits and behavior, I address the other matters that the chancellor considered to be the cumulative basis to support the cruel and inhuman treatment ground for divorce.
¶ 76. Rachel presented evidence that Steven had pornography in the home. She testified that, during 2004, she found a membership card to an adult bookstore. Rachel claimed that Steven was addicted to pornography, but she testified that she had not seen any pornographic videos in the home in over five years. More importantly, Rachel also testified that earlier in the marriage she participated in watching pornography with Steven. Rachel admitted and claimed that Steven used pornography since she’s known him. Based on this information, Steven’s use of pornography cannot be considered as part of the ground to grant a divorce on habitual cruel and inhuman treatment.
¶ 77. Rachel also presented evidence of Steven’s gambling addiction that was an ongoing source of stress throughout their marriage. Rachel claimed that Steven gambled in some fashion for as long as she has known him. Steven admitted that he had a serious gambling problem, and he voluntarily entered an in-patient program at COPAC, in 2007, to address the addiction. Steven incurred significant gambling *489 debt during the marriage, and the parties refinanced their home to pay off part of his gambling debt. However, Rachel admitted at trial that she did not have any evidence that Steven had gambled at all during 2007. She also admitted that Steven’s gambling never put the family in a financial crisis or caused any bills to go unpaid.
¶ 78. While Steven admitted that his gambling addiction caused serious problems in his marriage, the evidence presented at trial indicates that his family was financially supported throughout the marriage. The family’s necessities were completely furnished, including housing, utilities, food, and clothing. The only evidence of financial hardship presented by Rachel was the fact that she bought some clothes at garage sales to save money; however, Steven later testified that it was Rachel’s hobby to shop at garage sales with her mother and sister.
¶ 79. In Curtis v. Curtis, 796 So.2d 1044, 1047 (¶¶ 7-10) (Miss.Ct.App.2001), this Court held that the wife’s gambling addiction which led to a financial crisis and animosity between the couple that caused damage to the husband’s physical and mental health was insufficient to prove habitual cruel and inhuman treatment. Even though the husband became depressed because of the wife’s gambling, the ground for divorce was not established because “[l]ife, limb[,] and health were not threatened to such a degree as to warrant a divorce on this ground.” Id. at (¶ 10).
¶ 80. Rachel offered Steven’s medical records from COPAC. Apparently, Steven completed a men’s sexual-addiction-screening test during his treatment for gambling at COPAC. Steven was never diagnosed with a sexual addiction and chose not to voluntarily enter COPAC’s sexual-addiction-treatment program.
¶ 81. The majority finds that these statements made by Steven during his treatment at COPAC prove that Steven engaged in inappropriate sexual behavior sufficient to grant Rachel a divorce based on habitual cruel and inhuman treatment. However, the majority admits that Steven merely “admitted to unspecified inappropriate sexual activities.” Such unspecified statements are not sufficient. The majority further recognizes that “Steven’s CO-PAC records and writings reflect that he experienced about one hundred sexual partners.” Because there was no time frame or other point of reference to these unspecified admissions, it was unclear whether these statements relate to his relationship with Rachel or whether they occurred before the marriage. This evidence does not support a finding of habitual cruel and inhuman treatment.
¶ 82. The majority also cites Steven’s action of bathing with his children as evidence of his inappropriate sexual behavior so as to warrant a divorce based on habitual cruel and inhuman treatment. I cannot see how this evidence establishes grounds of divorce for Rachel. It does not establish that Steven treated Rachel or the children in a habitually cruel or inhuman manner. The record appears to me to contain sufficient evidence to support the fact that, after thorough examination, neither the guardian ad litem nor the chancellor found any instance of sexual abuse of the children. Without such a finding, this evidence cannot be used by Rachel to prove her ground for divorce. I cannot conclude how bathing with young children proves grounds for habitual cruel and inhuman treatment toward Rachel.
¶ 83. This Court must consider the effect that Steven’s conduct had on Rachel. The “impact of the conduct on the plaintiff is crucial[;] thus[,] we employ a subjective standard.” Faries v. Faries, 607 So.2d *490 1204, 1209 (Miss.1992). Nevertheless, the chancellor’s decision was primarily based on her finding that Steven was controlling, sexually degrading, and had a gambling addiction. I do not agree with the chancellor’s legal conclusion that Rachel proved habitual cruel and inhuman treatment. I find that neither life, limb, nor health was endangered to a point that made the marriage unsafe for Rachel. Nor do I find that the marriage was so unnatural or revolting as to make it impossible for Rachel to discharge the duties of the marriage. Further, we must recognize “[t]he fact that one spouse eventually grows weary of the other’s established behavior pattern does not give rise to the requisite standard for habitual cruel and inhuman treatment.” Talbert, 759 So.2d at 1109(¶ 9).
¶ 84. I conclude with a lengthy quote from the leading supreme court opinion that considered the facts necessary to establish the ground of habitual cruel and inhuman treatment. In Morris v. Morris, 804 So.2d 1025 (Miss.2002), the supreme court determined that verbal and emotional abuse was not sufficient to establish grounds for divorce under cruel and inhuman treatment. Former Chief Justice Jim Smith wrote for a unanimous supreme court:
The facts alleged by Tammy [Morris] as constituting habitual cruel and inhuman treatment are as follows. According to Tammy, Tim [Morris] was emotionally unsupportive when her close friend died of AIDS in 1991 and when her father died of cancer in 1992. Tim testified that he felt he was fully supportive and that Tammy never told him that she felt that he was unsupportive. Tammy testified that Tim made her feel guilty when he told her he felt neglected by her leaving home at one week intervals over a period of a year in order to spend time with her family after her father was diagnosed with cancer. Tim made Tammy feel that it was inconvenient for her family of ten, not to mention their three dogs, to stay at the house during the Christmas holidays of 1991. Tammy testified Tim attempted to control her life by repeatedly asking her to change her plans at the last minute, and that this made her feel guilty and made it difficult for her “to go and have a good time.” It is clear from the record, however, that Tammy had an extensive social life outside and inside the marital home, and that Tim rarely, if ever, curtailed the time she spent with friends or the frequency with which she entertained in the home.
Tammy testified that Tim went to Florida on Valentine’s weekend of 1993 to visit a college friend, Tammy Peoples. Tim testified that he never visited Tammy Peoples without Tammy and Dean[, the parties’ child]. Tammy also complained that on two occasions, Tim stayed out all night and did not call home.
When Tammy went back to work as a medical lab technician in 1993, Tim commented on the size of her paycheck and that her working was an inconvenience for the family. Tim testified that he supported Tammy’s desire to work, though he would have preferred her not work outside the home. Tammy’s testimony indicated that Tim was agreeable when she wanted to return to work. Tammy also testified that Tim supported her by helping her invest in a coffee shop, but made her feel that it was inconvenient for her to work at the coffee shop on weekends until 2 a.m. She also complained that he insisted on decorating the coffee shop. Tim asked Tammy not to have a drink with her ex-boyfriend, Steve Shoto, to discuss Steve’s marital problems. When Tam *491 my drove to Jackson to have a drink with Steve, Tim made her feel guilty by calling her a “sorry wife” and telling her to come home even though she was intoxicated. Tim became angry when Tammy would pick up his things around the house. Tim would not eat Tammy’s cooking. He did not compliment her yard work.
The couple’s sexual relationship deteriorated. Tammy testified that Tim suggested that her lack of sexual desire was due to the fact that she might be a lesbian, referring to Tammy’s one-time sexual encounter with another female prior to their marriage. She also stated that Tim repeatedly reminded her of the fact that she had an abortion prior to their marriage. Tim denied ever mentioning the lesbian affair to Tammy, but admitted to wondering aloud to Tammy what David Minchew, the man with whom she had the abortion, thought of when he looked at Dean. According to the record, Minchew had begun spending two to three weekends each month at the marital home after Tammy, admittedly, encouraged Minchew to leave his own wife. Tim testified that he made the comment to Tammy about the abortion after she began spending long hours on the phone with Minchew and after she began spending time with Min-chew in the guestroom when he would stay at the house on weekends.
Tammy testified that Tim often yelled at her and called her derogatory names. Tim testified that the couple argued, but that he never verbally abused Tammy. Two incidents complained of by Tammy were corroborated by third-party testimony. On one occasion, Tim allegedly told Tammy to “get off her fat a_” when he arrived home from work and she was drinking in the house with her friend, Katrina Davis. On another occasion, after the separation, Tim told Mike Allred, Tammy’s friend, that he should “just let Tammy go kill herself.” Florence Dean, Tammy’s mother, testified that Tim yelled frequently and was controlling.
Tammy became visibly depressed late in 1996. Tammy asked Tim to prescribe Prozac for her, which he did, but he gave her no comfort, which, according to Tammy, was what she really needed. Tim persuaded Tammy to seek psychiatric treatment with Dr. Sharon Pugh in January 1997. Tammy testified that Tim made her feel guilty about the amount of money Dr. Pugh charged, but she also stated that Tim never attempted to prevent her from seeing Dr. Pugh and that she did so as long as she desired. Dr. Pugh diagnosed Tammy with “major depression” and obsessive compulsive disorder. Tammy testified that the symptoms of the obsessive compulsive disorder were excessive hand-washing, anxiety, low self-esteem, and insecurity. She apparently does not attribute the obsessive compulsive disorder to Tim, only the depression.
It is clear from Dr. Pugh’s notes from her sessions with Tammy that Tammy suffered from low self-esteem and that she felt Tim ivas overly controlling, unreasonable, self-centered, and verbally abusive. Dr. Pugh’s notes refer to Tim as narcissistic and abusive. It is clear from the record, however, that at the time these notes were made, Dr. Pugh had never met with Tim and that her notes are solely from the information supplied to her by Tammy.
Tim agreed to see Dr. Pugh as well and met with her on two occasions prior to the separation. The notes from Dr. Pugh’s joint session with Tim and Tammy state as follows:
*492 Tammy was accompanied to the therapy session by her husband, Doctor Tim Morris. Tammy appeared strong and assertive during this session. Tim appeared euphoric with regard to their reconciling and “a Revelation from God.” Tim appeared somewhat extreme with his focus on religiosity but reality-based. This appears to be his way of dealing with this crisis in his life. He is motivated to do whatever it takes to reconcile their marriage. The issues continue to include Tim being controlling and making critical statements of his wife. Tammy is more aware of this communication problem and is working to confront it. Tim rejects continuing therapy with me as he wants to pursue a Christian counselor from a church in his hometown.
Tim testified he told Dr. Pugh he had a controlling and passive-aggressive personality. Tammy complained that Tim was unsupportive of the counseling sessions in that he refused to return for more sessions with Dr. Pugh. The record indicates, however, that Tim returned for at least ten sessions with Dr. Pugh.
Tammy left the marital home on June 1, 1997. She testified that she was forced to do so to save her health and that if she ever went back she “might even die. ” Tim testified that Tammy told him she was leaving in order to “find herself’ and make herself stronger for their marriage. He testified that he never wanted Tammy to leave and that he still wanted her to come home. Tim testified Tammy did not begin telling him he was trying to control her until two months before she moved out.
The record indicates that Tammy withdrew $1400 cash from the couple’s checking account two months prior to leaving the marital home. Shortly after Tammy left, Tim closed the checking account and cancelled all but one credit card. Tim paid three months of rent for Tammy, all utility deposits, YMCA dues in the amount of $340, and all of Dean’s tuition for 1997 and half thereafter. Tammy and Dean remained covered under the family medical/dental insurance. Tim referred to closing the checking account and destroying the credit cards as “damage control.”
Shortly after Tammy separated from Tim, she began a sexual relationship with Vance Jensen. Tammy testified that Tim, on two occasions, brought Dean to her apartment so that he could “catch her” with Jensen in Dean’s presence. Tim denied having such an ulteri- or motive. Tammy testified that on their ninth wedding anniversary, Tim found her car outside Jensen’s apartment and moved the car to the marital home. Tim later returned the car to Tammy, with her wedding dress inside. Tammy also testified that Tim once hit Jensen with a brick fragment in his hand and told Jensen to “stay away from his family.” Tammy also complained that Tim unilaterally cancelled Dean’s baptism, which was scheduled for the following day. Tim testified that he did so because he felt hypocritical dedicating his son to the Lord the day after he beat up his wife’s boyfriend.
The chancellor’s forty-three page opinion contains extensive findings of fact. Though the chancellor’s opinion contains several pages of discussion regarding Dr. Pugh’s diagnosis of Tammy’s depression and Tammy’s progress with treatment, Tammy argues that the chancellor failed to recognize the severity of the depression, and that the severity itself warrants that the divorce should have been granted. She relies on Chamblee v. Chamblee, 637 So.2d 850 *493 (Miss.1994), in which this Court stated that “habitual ill-founded accusations, threats [and] malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse.” Id. at 859 (quoting Kergosien v. Kergosien, 471 So.2d 1206, 1210 (Miss.1985)). This Court has explained that the cruelty required must be “so gross, unfeeling and brutal as to render further cohabitation impossible except at the risk of life, limb or health on the part of the unoffending spouse. ” Howard v. Howard, 243 Miss. 301, 303-04, 138 So.2d 292, 293 (1962). It is the opinion of this Court that the chancellor correctly concluded that Tim’s conduct did not rise to this level. Also, it is clear from Dr. Pugh’s medical notes in the months prior to Tammy’s separation from her husband that Tammy’s condition was improving and that her prognosis was “improving” and “good.”
Tammy also relies on this Court’s opinion in Robison v. Robison, 722 So.2d 601 (Miss.1998), in which this Court affirmed the chancellor’s finding of habitual cruel and inhuman treatment. Robison is clearly distinguishable from the case sub judiee. The evidence of verbal and emotional abuse presented by Ms. Robison went uncontradicted by her husband. Id. at 603. Ms. Robison testified that her husband told her he could not stand to be around her and that there was nothing she could do to make herself desirable to him, that he kept late hours and talked about having to engage in sexual relations with women at work to advance his career. Id. When the Robi-sons did, occasionally, have sex, Mr. Ro-bison threw her off the bed. Id. Mr. Robison continually criticized his wife’s appearance, never took her anywhere, and showed absolutely no affection. Id. Mr. Robison restricted his wife’s social life to the point of telling her who she could be friends with and where and under what circumstances she could go anywhere. Id. Mr. Robison began an adulterous relationship, left his family, and neglected them to the point that they could not afford groceries and friends had to hold a food drive. Id. The facts of this case, many of which are contradicted, simply do not rise to the level presented in Robison.
It cannot be said that the chancellor was manifestly in error in finding that Tammy failed to demonstrate cruelty and inhuman treatment as those terms have been defined by the decisions of this Court. Rather, her proof demonstrated the lack of communication, incompatibility, indignities, and intense quarreling alluded to above. No doubt, Tammy at least believed that she was the object of much criticism on the part of her husband and that he was overly controlling. This Court has held, however, that such conduct does not fulfill the requirements of a divorce on the grounds of habitual cruel and inhuman treatment. ...
In the similar case of Talbert v. Talbert, 759 So.2d 1105 (Miss.1999), this Court, holding that the facts did not meet the standard for cruel and inhuman treatment, stated:
The chancellor relied upon Mr. Tal-bert’s raising his voice to Mrs. Tal-bert, belittling her, and a few acts of violence very early in the twenty-seven-year marriage. The record indicates that Mr. Talbert exhibited insensitive and somewhat boorish, obnoxious, and selfish behavior throughout the period of the marriage, but again, the fact that one spouse eventually grows weary of the other’s established behavior pattern does not give rise to the requi *494 site standard for habitual cruel and inhuman treatment.... The fact that Mr. Talbert may be insensitive does not amount to proof of habitual cruel and inhuman treatment.
Id. at 1109. Furthermore, many of Tammy’s accusations were denied by Tim. In Chamblee v. Chamblee, 637 So.2d 850 (Miss.1994), this Court affirmed a chancellor’s finding that the appellant was not entitled to a divorce on the grounds of habitual cruel and inhuman treatment, stating:
The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts. The issue here was a factual one and the chancellor’s decision will not be disturbed since it was not manifestly wrong.
Id. at 860 (quoting Polk v. Polk, 559 So.2d 1048 (Miss.1990)). In the case at bar, as in Chamblee, the only person who actually testified that Tim treated Tammy in a cruel and inhuman manner was Tammy herself. Though Katrina Davis and Mike Allred confirmed two separate, isolated incidents of Tim’s behavior, neither in and of themselves rises to the level or continuity of conduct required by this Court’s interpretation of cruel and inhuman treatment.
Morris, 804 So.2d at 1027-1031 (¶¶ 9-23) (emphasis added).
¶ 85. While I regret the inclusion of such a lengthy quotation from prior case authority, I believe it necessary to compare the facts in Morris and the present case. In both cases, the conduct of one spouse to the other was not respectful and they did not have what some might call a functional or a fulfilling marriage. However, the supreme court requires, in order to prove habitual cruel and inhuman treatment, the non-offending spouse must show by a preponderance of evidence that:
the conduct either (1) endangers his or her life, limb, or health, or that the conduct creates a reasonable apprehension of such danger, making the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous that it makes the marriage revolting and impossible for the spouse to perform his or her marital duties, thus destroying the basis for the marriage to continue.
Cassell v. Cassell, 970 So.2d 267, 270(¶ 9) (Miss.Ct.App.2007) (citing Cochran v. Cochran, 912 So.2d 1086, 1089(¶ 11) (Miss.Ct.App.2005)). Additionally, “[t]he party seeking a divorce ... must show more than unkindness or rudeness or mere incompatibility or lack of affection.” Mitchell v. Mitchell, 767 So.2d 1037, 1041-42(¶ 14) (Miss.Ct.App.2000).
¶ 86. Further, the evidence supporting the chancellor’s decision must have been corroborated at trial. Just as in Morris, there is insufficient corroboration here. Rachel’s sister testified at trial and tried to corroborate Rachel’s claims that Steven was controlling and engaged in sexually degrading behavior. However, her sister also testified that she had not been in the marital home in over a year and had never been there more than once or twice a year. It is clear from the record that Rachel’s sister was relating what she had been told by Rachel, not what she personally observed. When asked what she had personally observed, she stated that she observed Steven talk down to Rachel and act like a bully. Corroboration is lacking in this case.
¶ 87. The supreme court has held that: Divorce is a creature of statute; it is not a gift to be bestowed by the chancellor based upon a perception that declining to grant the divorce will not restore the *495 couple to a harmonious relationship. It is a statutory act[,] and the statutes must be strictly followed as they are in derogation of the common law.
Massingill v. Massingill, 594 So.2d 1173, 1178 (Miss.1992) (quoting Kergosien v. Kergosien, 471 So.2d 1206, 1210 (Miss.1985)).
¶ 88. I agree that the parties’ marriage is, indeed, troubled and possibly irreparable. Professor Deborah H. Bell noted that “[t]he continuing strong public policy against divorce is reflected in the limited grounds for divorce enumerated by the [L]egislature, as well as the court’s strict application of the grounds.” Deborah H. Bell, Bell on Mississippi Family Law § 4.02 at 58 (2005) (emphasis added). Upon my consideration of this policy, combined with the strict adherence policy of Massingill, I find that Rachel presented insufficient evidence to prove the ground of habitual cruel and inhuman treatment. Accordingly, I find reversible error in the chancellor’s judgment.
¶ 89. I also disagree with and dissent from the majority’s decision to remand the visitation issue. Indeed, Rachel did not request this relief. The majority’s decision here is a sua sponte action of an appellate court, and it is improper. The majority substitutes its judgment for the chancellor’s.
¶ 90. Rachel NEVER made an allegation of child abuse against Steven. Rachel’s brief says the following about this issue:
although these concerns were properly presented to this Court, [Rachel] did not refer to these actions as sexual abuse. If [Rachel] is guilty of anything, she is guilty of under-reacting to [Steven]’s actions and confessions. [Rachel] nor anyone on her behalf called DHS, the police, or asked that criminal charges be filed. [Rachel] did not request a guardian ad litem. In fact, the only time the terms sexual abuse or improper sexual contact were mentioned was during a heated exchange between counsel, after counsel for [Steven] continued to attack Ruth Glaze for having the same concerns. [Rachel] has not made the type allegations required to trigger § 93-5-23 as found by the [c]hancery [e]ourt in its [supplemental [j]udgment and the guardian ad litem on page 9 of her interim report.
With regard to counsel for [Rachel]’s comments on the bathing issue, they are merely arguments of counsel in his representative capacity. Such comments cannot be attributed to [Rachel]. ...
(Emphasis added).
¶ 91. The majority, in my opinion, goes too far in criticizing the chancellor or the guardian ad litem for not investigating this behavior further as child abuse. The chancellor in this case is experienced, knowledgeable, and a dependable jurist who fulfills her obligation to protect children. Rachel does NOT testify that Steven abused the children. Indeed, if the author of the majority believes child abuse has occurred, the author has an independent duty to report this matter to DHS. This Court should not attempt to fulfill its obligation by ordering someone else do what it is not willing to do.
¶ 92. For these reasons, I respectfully dissent.

. Mississippi Code Annotated section 93-5-1 (Rev.2004) provides that a divorce may be granted to the injured party based on habitual cruel and inhuman treatment. Such ground for divorce is established by evidence that the conduct of the spouse either:
(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.
Kumar v. Kumar, 976 So.2d 957, 961(¶15) (Miss.Ct.App.2008).

. When questioned about her stomach problems, Rachel referred to her stomach problems as "at times indigestion. My stomach problems have over the years gotten much worse, and that can be attributed to the stress.” However, Rachel presented no medical evidence of her stomach problems. Even more telling, during this testimony about her stomach problems, Rachel never once mentioned Steven as the cause of her stomach problems, and only makes a general attribution to "the stress.”